845 So.2d 74 (2003)
Daniel LUGO, Appellant,
v.
STATE of Florida, Appellee.
No. SC93994.
Supreme Court of Florida.
February 20, 2003.
Rehearing Denied May 2, 2003.
*84 J. Rafael Rodriguez, Specially Appointed Public Defender, Miami, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, and Lisa A. Rodriguez and Sandra S. Jaggard, Assistant Attorneys General, Miami, FL, for Appellee.
PER CURIAM.
Daniel Lugo (Lugo) appeals his convictions of first-degree murder and his sentences of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons set forth below, we affirm both the convictions and the sentences of death. We also affirm Lugo's other convictions and sentences.

FACTS
Lugo's case involves an intricate set of facts, which at times involved many persons. Most of the criminal charges in this case are related to the abduction, extortion, and attempted murder of Marcelo (Marc) Schiller, or to the abduction, attempted extortion, and murders of Frank Griga and Krisztina Furton.

Abduction, Extortion, and Attempted Murder of Marc Schiller[1]
In the early 1990s, Marc Schiller was a wealthy Miami businessman who owned an accounting firm, Dadima Corporation. His business interests expanded into providing services that were reimbursed by Medicare. Schiller hired Jorge Delgado[2] to assist him with his business pursuits, and the two became close friends. Delgado often visited Schiller's home for both business and social reasons. Eventually, Schiller sold the Medicare-related portion of his business to Delgado, which retained the name "Dadima Corporation" after the sale.[3] Schiller selected a new name of "D.J. & Associates" for his accounting business. For a period of time after he sold the Medicare portion to Delgado, Schiller performed consulting work for Delgado and Dadima Corporation.[4]
Delgado exercised at Sun Gym in the Miami area, where Lugo was employed.[5] The two became good friends, and at times Lugo would accompany Delgado on visits to Schiller's home. Delgado also came to know Lugo's codefendants, Noel Doorbal and John Mese. Schiller believed Lugo to be an unsavory character, and expressed his concern to Delgado.
By 1994, a rift had developed between Schiller and Delgado. Schiller had been questioning Delgado's accounting practices with regard to Dadima Corporation, and was also concerned with transactions involving some bank accounts. During a meeting with a banker at a local restaurant, the conflict expanded as Delgado refused to respond to questions and became angry with Schiller. Thereafter, Schiller advised Delgado that he was severing all business ties and, on the advice of Lugo, Delgado hired John Mese to be his replacement accountant.[6]
*85 In the September-October 1994 time frame, Lugo advised Delgado of his belief that Schiller had been cheating Delgado with regard to the billing operations that Schiller had been performing for Delgado and the Medicare business. Delgado testified that Lugo showed him documentation which purported to prove that Schiller had been cheating Delgado. Lugo asserted to Delgado that Schiller had also been cheating Lugo. Schiller flatly denied accusations of cheating Delgado in the billing operation when Delgado confronted Schiller with the claim.
Lugo and his cohorts subsequently generated a plot to kidnap Schiller, with the goal of forcing him to sign over assets equivalent in value to that which Delgado and Lugo believed to be owed to them.[7] Delgado asked Lugo to do whatever he could to recover the value Schiller owed to both of them, but Delgado expressed that he did not want to be involved in any of the scheming. However, Delgado nevertheless became deeply involved in a plan to kidnap Schiller. He informed Lugo, Doorbal, and two men recruited by Lugo from Sun Gym (Stevenson Pierre and Carl Weekes) of details concerning Schiller's home,[8] family, cars, and personal habits. The group agreed to secretly observe Schiller to learn his daily routine to implement the plan. Testimony at trial established that Lugo was the unquestioned mastermind of the plan to abduct and extort money from Schiller. Stevenson Pierre observed Lugo's role to be that of a general in a military operation. The group eventually purchased or otherwise procured handcuffs, walkie-talkies, and a stun gun (among other items) to aid in the abduction plan.
After several failed attempts at locating and capturing Schiller, on November 15, 1994, the group finally succeeded in abducting him from the parking lot of the delicatessen restaurant he owned in the Miami area. Doorbal and Weekes grabbed Schiller, and Weekes subdued Schiller, shocking him with a stun gun. Another cohort, Sanchez, assisted Doorbal and Weekes in forcing Schiller into a waiting van. Inside the van, Schiller was handcuffed and duct tape was placed over his eyes. A gun was placed at Schiller's head, and his wallet and jewelry removed as the van proceeded to a warehouse that Delgado had rented. He also received additional shocks with the stun gun and he was kicked. Lugo arrived at the warehouse shortly after Doorbal and the others arrived with Schiller.
Schiller's captors demanded a list of his assets which Schiller initially refused to provide. The refusal resulted in his being slapped, shocked with the stun gun, and beaten with a firearm. Weekes questioned Schiller about his assets, based on information provided by Lugo and Delgado. Schiller testified that after he again refused to provide the requested information, he was told that he was going to engage in a game of Russian Roulette. A gun was placed to his head, the cylinder was turned, and the trigger was pulled *86 twice but no bullets fired.[9] Schiller's captors proceeded to read a highly accurate list of his assets to him, demanding that he corroborate what they already knew and that he add to the list assets of which they were not aware. The captors also apprised Schiller that they knew the alarm code for entry into his home. Because his assailants possessed such detailed knowledge of his assets and his home, Schiller surmised that Delgado must have been involved in the plot. Schiller also came to recognize Lugo's voice, despite Lugo's efforts to disguise the identity. Schiller testified that Lugo's speech often had a very recognizable lisp-like trait.
The captors further threatened that if Schiller did not cooperate, his wife and children would also be abducted and his wife raped in his presence. Schiller was eventually compelled to agree to cooperate but only if his wife and children were allowed to leave the country unharmed. In the ensuing days, Schiller began signing over his assets, including a quitclaim deed for his home, various documents granting access to his checking,[10] savings, and IRA accounts, and authorization for changing the beneficiary of his million-dollar insurance policies.[11]
During Schiller's captivity, Lugo and Doorbal entered Schiller's home and removed many furnishings and other items. Lugo, Delgado, and Weekes also began charging thousands of dollars to Schiller's credit cards. Money in Schiller's safe in his home was divided among Doorbal, Weekes, and Pierre. Three weeks into Schiller's captivity, Doorbal and Delgado convinced Lugo that Schiller must be killed, because he had likely surmised the identities of some, if not all, of his captors. A plan was then developed to kill Schiller but to give the appearance that Schiller's death resulted from the operation of his automobile under the influence of alcohol.
In the fourth week, Schiller was forced to consume large amounts of alcohol to make him intoxicated. Lugo drove Schiller's Toyota 4-Runner into a utility pole on a Miami-area street to create the impression that Schiller had been involved in an accident resulting from driving while intoxicated. Doorbal and Weekes accompanied Lugo, and Schiller was placed in the front seat of the 4-Runner after it had been driven into the pole. Lugo and Doorbal then poured gasoline on the vehicle and set it ablaze. Lugo, Doorbal, and Weekes had planned to exit the scene in another vehicle that Weekes had driven to the scene, but they noticed that Schiller had somehow managed to exit his burning vehicle and was staggering in the roadway. Schiller had not been securely bound in the seat of the vehicle. At the urging of Lugo and Doorbal, Weekes used his vehicle to strike and run over Schiller. The three left the scene of these events believing they had killed Schiller. Lugo later instructed Stevenson Pierre to drive by the scene to determine if there was any police activity.
Miraculously, Schiller survived this attempt to take his life. He remembered awakening in a Miami hospital having a *87 broken pelvis, ruptured bladder, bruises and burns, and temporary paralysis. Lugo and the others eventually learned that Schiller had survived, so they visited the hospital where they thought Schiller was recuperating, with a plan to suffocate him while he lay in his hospital bed. Unknown to Lugo and the others, based upon a well-founded fear for his safety, Schiller had already arranged to be airlifted to a New York hospital to complete his recuperation. Lugo, Doorbal, and some of the other captors proceeded to empty Schiller's home of the remaining furnishings and valuables. A black leather couch and computer equipment were among the articles pilfered.
Schiller's testimony at trial included not only a description of the events surrounding his abduction and captivity, but also testimony as to the assets that had been extorted from him and his attempts to recover those assets. He also stated that while he signed an agreement with Lugo and his cohorts, indicating that the events surrounding his "abduction" were actually the result of a failed business deal, he had always intended to report the incident to the police.[12] He thought that signing the agreement was an expeditious way to recover much of the value of the assets that had been extorted from him. Schiller further testified that he never willingly gave any of his assets to Lugo, Doorbal, Mese, Torres, or anyone associated with them. He noted that the quitclaim deed to the home that he and his wife owned was forged, because on the date indicated for his wife's purported signature, she was actually in South America.
Schiller identified several items of property that belonged to him or his wife and which police found in Lugo's possession. Among the items were computer equipment, furniture, and keys to a BMW automobile. He also stated that drafts on his checking account, which were payable to John Mese or to entities related to Sun Gym, must have been those signed by him when he was blindfolded during his captivity because he never willingly signed the drafts.[13] A forensic accountant confirmed that after an extensive review of records pertaining to corporations and accounts controlled by Lugo, Doorbal,[14] or Mese, it was clear that money and assets formerly in Schiller's control had been laundered.[15]

Abduction, Attempted Extortion, and Murders of Frank Griga and Krisztina Furton[16]
Frank Griga was also a wealthy Miami-area businessman, who accumulated much of his fortune from "900" lines in the phone industry. He and his girlfriend, Krisztina Furton, were both of Hungarian heritage. Lugo's codefendant, Noel Doorbal, learned of Griga through Doorbal's girlfriend at the time. Doorbal was quickly enthralled when shown a picture of a *88 yellow Lamborghini owned by Griga and when he learned of Griga's enormous wealth. Doorbal determined that Griga would be a prime target for kidnaping and extortion, and soon convinced Lugo to join his idea. Delgado was aware that Lugo and Doorbal intended to kidnap and extort a rich "Hungarian couple." Lugo was a full participant in the plot and he told his girlfriend, Sabina Petrescu, that he intended to kidnap a Hungarian who drove a yellow Lamborghini or Ferrari. Lugo also related to Petrescu that he worked for the Central Intelligence Agency (CIA), and that Doorbal was a killer who assisted him in his CIA missions. Petrescu testified that Lugo and Doorbal had at their disposal a suitcase with handcuffs and syringes[17] to use in the kidnaping.
Through an intermediary, Lugo and Doorbal arranged a business meeting with Griga to discuss Griga's interest in investing in phone lines in India. The Indian investment scheme was totally bogus and designed as a scheme for Lugo and Doorbal to ingratiate themselves with Griga and to gain his confidence. At the first meeting, Griga indicated his lack of interest but Lugo and Doorbal persisted.
In May 1995, Lugo and Doorbal gathered the suitcase containing handcuffs and syringes and made another visit to Griga's home, under the guise of presenting a computer to him as a gift.[18] Lugo and Doorbal each had a concealed firearm during this visit, as they intended to execute the abduction plan at this time. This first attempt was aborted after only a fifteen-minute stay. Doorbal was irate that Lugo did not follow through with the abduction, but he was placated with the news that Lugo had arranged another meeting with Griga for later that day.
When Lugo and Doorbal returned to Griga's home on May 24, 1995, they had concocted the scheme of inviting Griga and Furton to dinner, with the further goal of luring them to Doorbal's apartment, where the abduction and extortion would begin.[19] Between 10 and 10:30 p.m.,[20] Judi Bartusz, a friend of Griga's, saw Lugo and Doorbal leave Griga's home in a gold Mercedes, while Griga and Furton left in the Lamborghini.[21]
On May 25, Delgado met Lugo and Doorbal at Doorbal's apartment. Lugo informed him that Griga was already dead: Doorbal had killed Griga after the two became involved in a scuffle in and around the downstairs computer room in Doorbal's apartment.[22] Griga's body had been *89 placed in a bathtub in Doorbal's apartment.[23] Lugo related that when Furton had heard the scuffling between Doorbal and Griga, she rose from her seat in the living room and began to scream when she realized that Griga had been seriously injured. Lugo restrained her and subdued her with an injection of Rompun. Lugo expressed his anger toward Doorbal for having killed Griga before the extortion plan had been completed.
Lugo and Doorbal subsequently turned their focus toward Furton. They suspected that she must know the code to enter Griga's home. Knowledge of the code would allow Lugo and Doorbal to enter Griga's home with the hope of gaining access to valuables and, most importantly, bank account information for access to much of his wealth. Doorbal carried Furton down the stairs from the second floor of the apartment. Furton was barely clad, wearing only the red leather jacket that she had worn when she left Griga's home the night before, and a hood covered her head. Not long after Doorbal placed Furton near the bottom of the stairs, although handcuffed, she began screaming for Griga. At Lugo's direction, Doorbal injected Furton with more horse tranquilizer, causing her to scream again. Lugo and Doorbal then questioned Furton about the security code for Griga's home. Eventually, Furton refused to answer more questions. Doorbal injected her yet again with additional horse tranquilizer. Delgado testified that at this point, corrections officer John Raimondo arrived to "take care of the problem." Lugo informed Delgado that Raimondo had been solicited to kill Furton and to dispose of her body along with Griga's, but Raimondo did neither. He left Doorbal's apartment, referring to Lugo and Doorbal as "amateurs."
Armed with what he believed to be the access code for Griga's home security, Lugo took Petrescu to attempt entry while Doorbal and Delgado stayed behind. After failing to gain access to Griga's home, Lugo called Doorbal on his cellular phone. As the two talked, Petrescu heard Doorbal say, "The bitch is cold," which she believed was Doorbal's indication that Furton was dead.[24] Lugo returned to Doorbal's apartment, carrying some mail he had taken from Griga's mailbox. Lugo instructed Delgado that he should return home, but bring a truck to Doorbal's apartment the next morning.
When Delgado arrived with the truck on the morning of May 26, he noticed that Griga's body had been placed on a black leather couch that had been removed from the home of Marc Schiller.[25] Furton's body was placed in a transfer box. The *90 couch and the transfer box were loaded onto the truck. Neither body had been dismembered at this point.
Lugo, Doorbal, and Delgado proceeded with the bodies to a Hialeah warehouse. Delgado noticed a yellow Lamborghini stored there.[26] He served as a lookout while Lugo and Doorbal went to purchase items including a chain saw, hatchet, knives, buckets, flint (for igniting a fire), fire extinguisher, and a mask respirator.[27] When they returned, Lugo and Doorbal began dismembering the bodies of Griga and Furton. They used both the chain saw and the hatchet.[28]
Doorbal received a message on his pager and had to leave the warehouse, so Delgado drove him to his apartment. When Delgado returned to the warehouse, Lugo was attempting to burn the heads, hands, and feet in a drum. This attempt was largely unsuccessful and resulted in such a large amount of smoke that the fire extinguisher was used to smother the fire. Lugo and Delgado next went to Doorbal's apartment to remove everything, including the blood-stained carpeting, from the area where Doorbal and Griga had struggled. The items removed also included computer equipment stained with Griga's blood. The items were placed in the storage area of Lugo's apartment.[29]
By May 27, 1995, Lugo had traveled to the Bahamas in an attempt to access money *91 that Griga had deposited in bank accounts there. His efforts were unsuccessful and he returned to Miami. On May 28, 1995, Lugo, Doorbal, and Mario Gray disposed of the torsos and limbs of Griga and Furton. Lugo subsequently fled on a second trip to the Bahamas, where he was captured in early June 1995. He was apprehended in part due to information supplied to the police by his girlfriend, Sabina Petrescu.
At trial, the State presented more than ninety witnesses. Lugo presented no witnesses or evidence on his behalf during the guilt-innocence phase. The trial judge denied Lugo's motions for judgment of acquittal. The jury convicted Lugo of all thirty-nine criminal counts with which he was charged,[30] and he was adjudicated guilty on all thirty-nine counts. Lugo's motion for new trial or, in the alternative, for arrest of judgment, was denied.
The State presented only victim impact evidence in the penalty phase. Lugo presented two witnesses on his behalf in the penalty phase: his mother, Carmen Lugo, and Santiago Gervacio, a long-time friend. Lugo's mother presented testimony concerning two isolated incidents in which Lugo had been mistreated by his father when he was a child as punishment for misbehavior. One incident involved corporal punishment with a clothes hanger. The other occurred when Lugo's father poured a bowl of spaghetti over Lugo's head when he refused to eat. Lugo's mother testified that on the whole, however, Lugo was raised in a loving home, that both she and his father loved him, and that he displayed love toward them both. Santiago Gervacio testified that Lugo was a passive person whom he had never seen commit a violent act. He also stated that Lugo showed great love toward his deceased sister's four children, and even adopted them. Gervacio added that Lugo showed love toward his parents.
The jury voted, eleven to one, to recommend that Lugo receive the death penalty for the murders of both Griga and Furton. The circuit judge accepted the jury's recommendation of death for each of the murders, sentenced Lugo to death for each of those offenses, and adjudicated him guilty on all thirty-nine counts of which he was convicted. The court ordered that all sentences were to run consecutively. In his sentencing order, the trial judge found five aggravating factors applicable to both murders: prior violent felonies (including *92 the contemporaneous murder of the other victim, and the armed kidnaping, armed robbery, and attempted murder of Schiller); commission during the course of a kidnaping, for the purpose of avoiding arrest and for pecuniary gain; and cold, calculated, and premeditated (CCP). Additionally, the trial judge found that the heinous, atrocious, or cruel (HAC) aggravator applied to the Furton murder. The trial judge gave great weight to each of these aggravators. He also found no applicable statutory mitigators but five nonstatutory mitigators existed, each of which was given little weight or very little weight.[31] This direct appeal followed.

GUILT PHASE

Denial of Motion to Sever Criminal Charges
Lugo asserted before trial that he was entitled to have separate trials on the Racketeer Influenced and Corrupt Organization (RICO) counts,[32] the Schiller counts, and the Griga-Furton counts. He contended that a single trial on all the counts would result in spillover prejudice to the extent that jurors would not be able to make individual determinations of guilt or innocence regarding each criminal charge.[33] The trial judge denied Lugo's motion to sever the sets of counts from each other and to have separate trials. The only relief granted by the trial judge after a hearing on the motion was that Lugo would have a separate jury from codefendants Doorbal and Mese.[34]
Denial of a motion for severance of criminal charges is reviewed for abuse of discretion. See Crossley v. State, 596 So.2d 447 (Fla.1992). We have previously stated:
"[T]he rules [of criminal procedure] do not warrant joinder or consolidation of criminal charges based on similar but separate episodes, separated in time, which are connected only by similar circumstances and the accused's alleged guilt in both or all instances." Courts may consider "the temporal and geographical association, the nature of the crimes, and the manner in which they were committed." However, interests in practicality, efficiency, expense, convenience, and judicial economy, do not outweigh the defendant's right to a fair determination of guilt or innocence.
Wright v. State, 586 So.2d 1024, 1029-30 (Fla.1991) (citations omitted) (quoting Garcia *93 v. State, 568 So.2d 896, 899 (Fla.1990)). Florida Rule of Criminal Procedure 3.150[35] requires that the criminal charges joined for trial "be considered in an episodic sense." Garcia v. State, 568 So.2d 896, 899 (Fla.1990). Moreover, there must be a "meaningful relationship" between or among the charges before they can be tried together. Ellis v. State, 622 So.2d 991, 999 (Fla.1993). That is to say, "the crimes in question must be linked in some significant way." Id. at 1000.
Lugo primarily addresses the trial court's failure to grant his pretrial motion to sever the Schiller counts, the Griga-Furton counts, and the racketeering counts[36] from each other so that separate trials could be conducted on each set of charges. However, he generally fails to address the important part that the racketeering charges had in the trial judge's decision to deny the motion for severance.[37] The trial judge noted that the State had properly pled the racketeering *94 related charges in the indictment, with events involving the Schiller counts and the Griga-Furton counts serving as two of the required predicate acts. He also noted that he was being asked "in advance of hearing one shred of evidence [during the trial]" to sever the Schiller counts, the Griga-Furton counts, and the racketeering counts, when one of the crucial points that the State intended to assert was that the Schiller counts and the Griga-Furton counts were integral parts of the very racketeering enterprise in which Lugo and others had engaged. At the pretrial hearing, the trial judge indicated that Lugo was free to file a formal motion to dismiss the racketeering charges if the State failed during trial to present evidence of the link between the Schiller and Griga-Furton counts and their relationship to Lugo's alleged racketeering activities. On the facts before us, we are not prepared to determine that the trial judge erred in his conclusion that the RICO charges provided a "relevant relationship" between the Schiller and Griga-Furton counts, thereby justifying a single trial on all charges filed against Lugo. This conclusion reflects the requirement that there be a "meaningful relationship" among charges that are tried together, as we discussed in Ellis. See Ellis, 622 So.2d at 999. Moreover, unlike Ellis, the instant case involves charges of racketeering that link criminal incidents which might appear upon initial inspection to be temporally unrelated because they occurred within a six-month span.[38] The racketeering charges provide the "significant way" in which the Schiller counts, the Griga-Furton counts, and Lugo's alleged racketeering activity were linked. See generally Ellis, 622 So.2d at 1000.
Florida law fully supports the trial judge's conclusion. In Shimek v. State, 610 So.2d 632 (Fla. 1st DCA 1992), the appellant, an attorney, sought before trial to have one count of grand theft severed both from other counts of grand theft and from a count of racketeering. The appellant contended that severance was necessary because one grand theft count (the "Skipper" count) involved investing settlement funds of a client of his legal practice in a bank that engaged in questionable practices, whereas the other grand theft counts (the "Pierce-LaCoste" counts) involved investors sought by the appellant or the principals of that same bank. The appellant argued that the count involving his client was not related in an episodic sense to the other grand theft counts or to the racketeering count, but the trial court denied the motion to sever. In concluding that the trial court did not abuse its discretion in denying the motion to sever, the district court noted several relationships between the Skipper and Pierce-LaCoste counts: the appellant and several principals of the subject bank were involved in each set of counts; each set of counts centered on an investment scheme involving the subject bank; and in each set of counts the appellant used his attorney trust account to channel funds to the subject bank. See id. at 636-37. The district court concluded not only that the Skipper and Pierce-LaCoste grand theft counts were related to each other and constituted predicate acts for the racketeering count, but also that the grand theft counts were linked to the racketeering count in such a *95 way that a unified trial on all of the grand theft counts and the racketeering count was justified. See id. at 640.
We note that the district court in Shimek had the benefit of reviewing the entire record of the trial in determining the link between the grand theft counts and the racketeering counts. In the instant case, Lugo sought before trial to sever the Schiller, Griga-Furton, and racketeering counts from each other before any evidence of the relationship of the Schiller and Griga-Furton counts to the alleged racketeering activity had been subjected to adversarial testing during the trial. The trial judge reviewed the indictment against Lugo and determined that the State conformed to the pleading requirements of Florida's substantive RICO statute. The trial court did not abuse its discretion by declining Lugo's pretrial motion to sever, especially when it indicated that it would entertain a formal motion to dismiss the racketeering charges if the State did not present sufficient evidence during trial to support them. Moreover, as in Shimek, the existence of several relationships between the Schiller counts and the Griga-Furton counts, and their links to the racketeering counts, justified the trial judge's decision to conduct a unified trial.
We also disagree with Lugo's contention that the racketeering activities were not related in an episodic sense. The unfortunate racketeering activity in which Lugo and others participated began with the abduction, extortion, and attempted murder of Marc Schiller, continued with the incident involving the planned abduction and extortion of Winston Lee, and reached its tragic pinnacle in the events related to the abduction and terror-filled murders of Frank Griga and Krisztina Furton. The careful planning that surrounded each of these incidents, along with the manner of execution, obviates the conclusion that they were entirely random, disconnected events.
With regard to the abduction and subsequent crimes against Schiller, as well as the abduction and subsequent crimes against Griga and Furton, the record indicates that at least one plot was aborted before an actual abduction took place. Each plot involved intricate planning and the assignment of specific duties to each participant, including Lugo. Indeed, in the Schiller abduction, testimony adduced at trial described Lugo's role as equivalent to that of a military general. Stun guns, handguns, and tape, among other items, were employed to subdue or restrain Schiller. Lugo and Doorbal also visited Griga's Golden Beach home before the abduction of Griga and Furton occurred. During the last visit before the abduction occurred, Lugo and Doorbal each had a concealed firearm. Testimony from Sabina Petrescu, Lugo's girlfriend, indicated that Doorbal was very upset when Lugo did not follow through on the plan to kidnap Griga and Furton during this particular visit, but was later placated by Lugo with the knowledge that they would execute the abduction later that evening. While Griga and Furton were held hostage, both were subdued with Rompun, which Lugo and Doorbal had procured for that specific purpose. Furton was also subdued with handcuffs and tape, as was Schiller. Furthermore, it is important to note that in the intervening months between the Schiller and Griga-Furton abductions, Lugo directed the surveillance of Winston Lee's townhome, with the goal of abducting Lee and obtaining his assets. This type of activity over a six-month period does not have the characteristics of impulsive, sporadic behavior. The nature of these crimes removes them from the category of being merely similar to each other, and requires that they be placed in the category of "connected acts *96 or transactions." Fla. R.Crim. P. 3.150(a).[39]
We further note that if separate trials on the Schiller and Griga-Furton counts had been held, evidence of the abduction, extortion, and attempted murder of Schiller would have been admissible in Lugo's trial for the abduction, attempted extortion, and murders of Griga and Furton, and vice versa. This evidence would have been admissible in separate trials to establish the existence of an ongoing, common scheme to target wealthy victims, as well as to establish the entire context within which Lugo's criminal activity occurred. See, e.g., Fotopoulos v. State, 608 So.2d 784, 790 (Fla.1992) (determining that severance of murder charges was not required, in part because evidence of commission of one murder would have been admissible in a separate trial of the other to show a common scheme and context in which criminal activity occurred); Bundy v. State, 455 So.2d 330, 345 (Fla.1984) (determining that severance of murder charges was not required, in part because evidence of murder at one location would have been admissible in separate trial for murder at other location due to common scheme involved in both), abrogated on other grounds, Fenelon v. State, 594 So.2d 292 (Fla.1992).[40] Therefore, due to the common scheme that is related to both the Schiller and Griga-Furton counts, Lugo "has failed to demonstrate that a severance was necessary for a fair determination of his guilt or innocence." Bundy, 455 So.2d at 345.
Based on the reasons above, we determine that the trial judge did not abuse his discretion when he denied *97 Lugo's pretrial motion to sever charges.[41]

Sufficiency of the Evidence for RICO Convictions
Lugo asserts that there was insufficient evidence to support his convictions for RICO activity and conspiracy to commit RICO activity.[42] The elements of a crime under Florida's RICO statute[43] are (1) conduct or participation in an enterprise through (2) a pattern of racketeering activity. See, e.g., Gross v. State, 765 So.2d 39, 42 (Fla.2000). With regard to the "enterprise" element, the State must prove the following subelements: (1) an ongoing organization, formal or informal, with a common purpose of engaging in a course of conduct, which (2) functions as a continuing unit. See id. at 45.[44]
Lugo's assertion that the State failed to prove the enterprise requirement is unavailing. The State proved, through the testimony of Jorge Delgado and others, that Lugo, Doorbal, and others specifically associated for the illicit purposes of kidnaping and extorting money from Marc Schiller, as well as the illicit purposes of kidnaping and securing the assets of Griga and Furton. When we further consider the coordinated events, especially surveillance activity, surrounding the planned (but never executed) abduction and extortion of Winston Lee, we determine that competent, substantial evidence supports the enterprise element of the RICO statute.
Specifically, testimony regarding the militaristic nature in which Lugo, Doorbal, and others conducted the abduction and extortion in connection with Schiller proves an association for illicit purposes regarding that event. The common purpose and continual functioning of the organization were further shown by the testimony describing the coordinated but ultimately aborted plan to abduct and seize the assets of Winston Lee a few months after the Schiller episode. The culmination of the organization's common *98 purpose and continual functioning was the careful planning and execution of the abductions of Griga and Furton. Jorge Delgado testified that Doorbal had developed a plan to kidnap and extort money from "a Hungarian couple." Lugo later confirmed Doorbal's plan to Delgado. Lugo and Doorbal subsequently ingratiated themselves with both Griga and Furton while plying Griga with visions of enormous profits from their bogus scheme to invest in phone lines in India. As in the abduction of Marc Schiller and the hoped-for abduction of Winston Lee, the abductions of Griga and Furton were, most assuredly, not random, spur-of-the-moment events lacking a common purpose and organizational structure. Rather, the events surrounding the involvement of Lugo and his team of evil with Schiller, Lee, Griga, and Furton evince a common purpose of carefully targeting specific victims for abduction and extortion. Moreover, in each instance at least one plan to abduct each victim was aborted or never executed, further evincing the non-random nature of the organization with which Lugo was associated.[45] Lugo and his organized group planned their crimes in advance and employed devices they had acquired to facilitate those crimes.[46] Therefore, "[a] jury could reasonably conclude that [Lugo] and his associates shared the requisite common purpose of an ongoing organization," Gross, 765 So.2d at 47, thereby establishing the first subelement of the enterprise element.
The State also proved that the organization with which Lugo was associated functioned as a continuing unit, thus satisfying the second subelement of the enterprise requirement. "Continuity [of an alleged RICO enterprise] exists where an unchanging pattern of roles is necessary and utilized to carry out the predicate acts of racketeering." Id. at 46.[47] Lugo contends that the State's evidence failed to show an unchanging pattern of roles. We disagree. Stevenson Pierre testified that Lugo directed the Schiller abduction in militaristic fashion. Jorge Delgado testified that Lugo coordinated the surveillance of Winston Lee's townhouse in preparation for an abduction attempt that never materialized. Delgado's testimony also established that while the initial plan to kidnap and obtain the assets of Griga and Furton may have been Doorbal's, Lugo was heavily *99 involved in the planning and was a primary participant in the execution of the Griga-Furton abduction. Lugo participated in several conversations with Griga prior to the kidnaping, in which Lugo and Doorbal floated their contrived plan for phone lines in India. Lugo and Doorbal also jointly lured Griga and Furton out of Griga's home on May 24, 1995, with the intent of implementing their kidnaping and extortion plan. Moreover, Lugo subsequently not only injected Furton with Rompun but also directed Doorbal to do soacts which independently or in concert contributed to Furton's death. Based on these facts, competent, substantial evidence supports the conclusion that Lugo assumed and carried out a managerial function in the three major undertakings of an organization whose purpose was to kidnap carefully targeted victims and to extort money from them. Doorbal was literally his partner in crime, making for an unchanging pattern of roles which was utilized to execute the predicate acts of racketeering.
We further determine that the State presented competent, substantial evidence to prove the pattern of racketeering element.[48] To satisfy the pattern of racketeering requirement, the State must offer proof of the "similarity and interrelatedness of racketeering activities [and] proof that a continuity of particular criminal activity exists." State v. Lucas, 600 So.2d 1093, 1094 (Fla.1992) (quoting Bowden v. State, 402 So.2d 1173, 1174 (Fla.1981)).[49] Relying primarily on H.J., Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), Lugo claims that the predicate acts listed in the indictment against him were actually isolated incidents that extended over no more than a few weeks or months and, most importantly, did not threaten any future criminal conduct. We disagree.
The predicate acts in which Lugo and his organized group engaged spanned approximately a six-month period. In State v. Lucas, 600 So.2d 1093 (Fla.1992), we determined that predicate acts involving a series of fraudulent investment-related activities met the continuity requirement of the pattern of racketeering element when those acts were perpetrated over a six-month period. Specifically, we concluded that the fraudulent activities in Lucas conformed to the concept of "open-ended" continuity discussed in H.J., Inc., because the only thing that prevented the enterprise from perpetrating subsequent fraudulent acts was the arrest of some of its key members.[50] Since the organization *100 had performed predicate acts in the past and posed a real threat of executing similar predicate acts in the future, a pattern of racketeering was established. See Lucas, 600 So.2d at 1095-96.
The logic in Lucas applies to Lugo's case. The arrests of Lugo, Doorbal, Delgado, and others associated in the RICO enterprise effectively forced the enterprise out of business. Had those arrests not occurred, there would have been nothing to keep the enterprise from executing further kidnaping and extortion plots. Just as in Lucas, "[t]he nature of the operation [with which Lugo was associated] suggests the threat of continued criminal activity." Lucas, 600 So.2d at 1095. Moreover, Jorge Delgado's testimony afforded insight into the level of sophistication that Lugo and his companions invested in their abduction and extortion activities. Abduction and extortion "was the business in which [Lugo and his group] had associated themselves." Id. Therefore, the continuity of particular criminal activity is again shown because "the threat of continued criminal activity [can] be proven by showing the predicate acts to be part of an ongoing entity's regular way of doing business." Id. Finally, we note that both in Lucas and in Lugo's case, the predicate RICO activities "were directed toward different persons, and there is no suggestion that they occurred at the same time." Id. at 1096.
Therefore, based on the above, we conclude that competent, substantial evidence supported Lugo's RICO convictions. The State presented evidence to satisfy both the "enterprise" element and the "pattern of racketeering activity" element as required. No relief is warranted on this issue.

State's Opening Argument
Lugo asserts that fundamental error occurred during the State's opening argument, warranting a new trial.[51] When we consider the challenged comments in the totality of the circumstances of Lugo's trial, we disagree.
Lugo contends that comments by the prosecution discredited a legal defense on which he supposedly intended to rely. However, he fails to assert in any detail what legal defense was discredited. Moreover, our review of the prosecution's comments does not reveal that any of Lugo's defenses were specifically and pointedly discredited. Therefore, we decline to grant relief on that basis.
*101 The other cases on which Lugo relies are distinguishable. In First v. State, 696 So.2d 1357 (Fla. 2d DCA 1997), the district court reversed the defendant's conviction when the prosecution, during opening argument, called the defendant's main alibi witness a "liar." Unlike the circumstances in this case, counsel for the defendant in First contemporaneously objected to the prosecution's comment. Moreover, in First the district court noted the completely circumstantial nature of the evidence against the defendant and its less than compelling nature. Conversely, in Lugo's case, direct evidence in the form of testimony by Jorge Delgado and others familiar with Lugo's involvement in the various schemes with which he was chargednot to mention the physical evidence garnered against Lugo along with his leading police to the location where Griga and Furton's body parts could be foundpresents a much more compelling case for Lugo's guilt. We therefore cannot conclude that error occurred in the prosecution's opening statement such that it "reache[d] down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." McDonald v. State, 743 So.2d 501, 505 (Fla.1999) (quoting Urbin v. State, 714 So.2d 411, 418 n. 8 (Fla. 1998)).
Lugo's reliance on Traina v. State, 657 So.2d 1227 (Fla. 4th DCA 1995), is also unavailing. While the opinion in Traina states that it is improper for a prosecutor to attack a defendant's character, the court nevertheless concluded in Traina that the challenged comments did not constitute reversible error in light of the evidence of the defendant's guilt. Finally, in Fernandez v. State, 730 So.2d 277 (Fla.1999), on which Lugo also relies, we noted that although the prosecution characterized the defendant as a "robber" and "murderer," these statements were generally supported by record evidence. In Lugo's case, the evidence shows that the murder victims were in fact preyed upon, tortured, dismembered, and burned, which the prosecution detailed in its opening statement in sometimes graphic terms. While we caution both prosecution and defense counsel in every trial to focus the opening statements on the evidence and facts to be proven, we cannot say that when viewed in the totality of the circumstances of Lugo's case, the prosecution's comments drifted so far afield from the evidence adduced at trial as to constitute fundamental error. At most, selected comments by the prosecutor were intemperate and may have walked the edge of emotion, but the error, if any, was ultimately harmless. Therefore, no relief is warranted on this issue.

Adverse Cross-Examination by Codefendant Doorbal
Next, Lugo claims that his right to a fair trial was impinged by codefendant Noel Doorbal's adverse cross-examination of several State witnesses. Lugo asserts that this cross-examination attempted to shift all blame to Lugo and effectively compelled Lugo to defend against two different prosecution teams: the State and his codefendant, Doorbal.
Lugo asserts a litany of instances in the record in which he alleges that cross-examination by Doorbal made him appear to be doubly guilty in the eyes of the jury. However, we agree with the State that in most, if not all, of the instances cited by Lugo, Doorbal's cross-examination of witnesses amounted to an examination of the evidence the State had presented. This evidence in many instances not only inculpated Lugo but also Doorbal. Each defendant in a trial is entitled to engage in vigorous cross-examination *102 of the witnesses presented against him. See, e.g., Oakes v. State, 746 So.2d 510, 511 (Fla. 5th DCA 1999) (stating that "a defendant in a criminal case has the constitutional right to fully cross-examine a prosecution witness concerning events about which the witness testified during direct examination"). Moreover, in many of the instances which Lugo cites as being improper adverse cross-examination by codefendant Doorbal, Lugo failed to object to preserve the issue for review. This leaves fundamental error as the only basis for relief and we decline to apply such doctrine to grant relief on this issue.
Moreover, in McCray v. State, 416 So.2d 804 (Fla.1982), we concluded that in a trial in which appellant McCray asserted that his right to a fair trial was violated "because the defenses of [his] codefendants... were completely antagonistic to his defense," id. at 806, the joint trial of McCray and his codefendants "did not in any way prejudice the right of [McCray] to a fair determination of his guilt or innocence of the offense [of first-degree murder]." Id. at 807. We noted in McCray that the appellant had a full opportunity to cross-examine all witnesses brought against him, and that the evidence was not so complex that the jury could not understand the case, apply the evidence, and make individualized determinations of guilt regarding each defendant. See id. at 806-07. These same circumstances hold true in Lugo's case and lead us to the conclusion that Lugo was not deprived of his right "to a fair determination of his guilt or innocence of the offense[s] charged." Id. at 807. We therefore deny relief on this issue.[52]

Evidence of Lugo's Federal Fraud Conviction and Probation
Lugo claims that the State impermissibly introduced evidence pertaining both to his prior federal conviction for fraud and his federal probation to establish his propensity to commit crimes or bad acts. The State asserts that introduction of the evidence was proper to show the involvement of both Lugo and codefendant Mese in a scheme to launder money, gained from the extortion of Marc Schiller, that Lugo ultimately used to pay restitution for his federal fraud conviction and thereby end his probation early. With some qualification, we agree with the State.
The State presented various witnesses, including Lugo's federal probation officer, who testified as to their knowledge of various aspects of Lugo's previous federal fraud conviction or the probation he was serving for that conviction. Most of the testimony from these witnesses was properly linked to other evidence presented by the State that Lugo and codefendant Mese had laundered proceeds garnered from the abduction of Schiller through various accounts controlled by Mese, with the goal of allowing Lugo to pay approximately $70,000 in restitution to end his federal probation early.[53] In short, the State *103 showed a motive for Lugo and Doorbal to launder money.
In Bryan v. State, 533 So.2d 744 (Fla. 1988), we addressed the admissibility of evidence related to a collateral crime:
[T]he test of the admissibility of such evidence [is] one of relevancy. Even if the evidence in question tends to reveal the commission of a collateral crime, it is admissible if found to be relevant for any purpose save that of showing bad character or propensity [to commit crimes or other bad acts].
Id. at 746-47 (quoting Randolph v. State, 463 So.2d 186, 189 (Fla.1984)). Our review of the record convinces us that the State's evidence regarding Lugo's federal conviction and probation was highly relevant to proving allegations of money laundering. Much of the State's evidence on this issue established that one motive for Lugo and codefendant Mese to engage in money laundering was to bring Lugo's probation to an early end. Moreover, testimony further established that Lugo and Mese acted on this motivation by facilitating the laundering of money gained from the Schiller episode through accounts controlled by Mese. In a criminal case, "[e]vidence of other crimes, wrongs, or acts is admissible to prove the defendant's motive." Charles W. Ehrhardt, Florida Evidence § 404.14 (2002 ed.). In Sims v. State, 681 So.2d 1112 (Fla.1996), we determined that evidence of a defendant's current status of being on parole was properly admitted to show the defendant's motive for murdering a police officer when the police officer stopped the car the defendant was driving. A drug-sniffing dog at the scene subsequently alerted the police officer to the possible presence of illegal drugs in the defendant's car. We determined that the trial judge properly admitted testimony from the defendant's parole officer because "the State offered [the parole officer's] testimony to establish [the defendant's] parole status and the fact that he knew illegal drug possession was a parole violation" that would result in his incarceration if detected by the police officer. Id. at 1115. We added that while the defendant's parole status was not independently admissible during the guilt phase of his trial, "it became relevant and admissible when it was linked to a motive for murdering the police officer." Id. In Lugo's case, evidence of his conviction and probationary status was relevant and admissible to show his motive for, and need for, engaging in money laundering. The probative value of the evidence to show money laundering outweighed the possible prejudice to Lugo. See Amoros v. State, 531 So.2d 1256, 1260 (Fla.1988) (noting that to be admissible, evidence must be relevant and its probative value must outweigh the possibility of prejudice to the defendant).
Accordingly, we determine that no harm warranting a new trial occurred due to the introduction of evidence concerning Lugo's federal fraud conviction and probationary status.[54] No relief is warranted on this issue.

*104 Possible Bias of State Witness Lillian Torres

Lugo's ex-wife, Lillian Torres, was presented as a witness by the State. Her testimony primarily concerned her role in the transfer of a home owned by Marc Schiller. As part of the extortion involved with Schiller, Lugo compelled Schiller to sign a document effecting the transfer of a condominium he owned in the Miami area. The ultimate transferee was Lillian Torres.[55] Lugo claims that reversible error occurred when, on cross-examination of Torres, his counsel was prohibited from asking Torres whether her lawyer accompanied her when she was subpoenaed for questioning at the state attorney's office with regard to her knowledge of the events in which her ex-husband had been involved.
This issue warrants little discussion. The record clearly shows that Lugo's counsel was allowed to inquire as to any biases toward the State that Torres may have had. The cross-examination did not yield any evidence of any deals between the State and Torres, nor did Lugo present any compelling evidence of a deal during his trial. We agree with the trial judge that the relevant and permissible inquiry concerned Torres's possible bias toward the State, not whether her lawyer accompanied her during questioning. Lugo's reliance on Jean-Mary v. State, 678 So.2d 928 (Fla. 3d DCA 1996), is misplaced. In Lugo's case, unlike the circumstances in Jean-Mary, the witness under cross-examination had not been arrested and charged with a crime which would warrant further inquiry by defense counsel. Therefore, Jean-Mary is inapposite. No relief is warranted.

Brady Violations
Lugo contends that two violations of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), occurred, each of which warrants a new trial or entitles Lugo to conduct further discovery on the matter. We determine that each assertion is without merit.
Lugo first contends that a Brady violation occurred due to the State's failure to disclose its knowledge of the federal investigation of Marc Schiller for Medicare fraud. Schiller was presented as a witness by the State during the guilt-innocence phase regarding the events surrounding *105 his abduction and his loss of assets.[56] The record reflects that Lugo was aware Schiller would testify during trial. Moreover, the record establishes that through a pretrial deposition of Jorge Delgado, Lugo knew not only that Delgado may have been involved in Medicare fraud, but also that Delgado had alleged Schiller was also involved in the fraud. At a post-trial Richardson[57] hearing on the matter, the State indicated that it turned over knowledge of Delgado's possible involvement to federal authorities. The State denied having knowledge that Schiller was the specific target of a federal investigation, and stated that Schiller had denied involvement in Medicare fraud when questioned. The State further denied having made any deals with Schiller to speak with federal authorities on his behalf in exchange for favorable testimony at Lugo's trial. Most important, Lugo failed to present any evidence at the hearing that the State either withheld any document or other knowledge of the possibility of a federal investigation into Schiller's Medicare activities, or that the State had made a deal with Schiller to speak with federal authorities in exchange for favorable testimony. The trial judge denied Lugo's motion for a new trial or, in the alternative, a new round of discovery concerning the State's knowledge of Schiller's indictment on Medicare fraud charges. This decision was not erroneous.
The three elements of a Brady claim are: (1) The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice to the defendant must have ensued. See Way v. State, 760 So.2d 903, 910 (Fla.2000). Even if Lugo could establish the first element, he cannot satisfy either the second or third elements, because he was fully aware of Schiller's possible involvement in Medicare fraud and therefore cannot establish how he was prejudiced by the State's alleged failure to disclose its knowledge of Schiller's activities with regard to Medicare. That Schiller was subsequently indicted on federal Medicare fraud charges is of little import in the wake of Lugo's failure to establish that the State knew of Schiller's pending indictment or had any involvement with it whatsoever.[58] We further note that Lugo had a full opportunity to cross-examine Schiller, contrary to Lugo's contention. Lugo contends that because he was not allowed to ask Schiller why he and his codefendants believed that Schiller committed Medicare fraud, his right to cross-examine an adverse witness was violated. The trial court sustained the State's objection on the basis that the question called for speculation on Schiller's part. We determine that the trial court did not err in sustaining the objection, and that its action did not impinge on Lugo's right to a vigorous cross-examination of Schiller. Moreover, this incident was isolated and did not affect Lugo's right to a fair trial. No relief is warranted on this issue.[59]
*106 Lugo next argues that a Brady violation occurred due to the State's failure to disclose that the medical examiner, Dr. Mittleman, who testified in the guilt-innocence phase of Lugo's trial, had been the subject of an administrative investigation in a case unrelated to Lugo's. We disagree.
Dr. Mittleman was the subject of an administrative, not a criminal, inquiry. The record shows that the investigation concluded that he had failed to follow a recording protocol in reporting some of his findings in an unrelated caseat most, a very minor error. The trial judge declined to grant relief to Lugo because Dr. Mittleman did not opine as to the specific or exclusive cause of death of Griga or Furton. In Breedlove v. State, 580 So.2d 605 (Fla.1991), an appellant who had been charged with and convicted of murder alleged that a Brady violation occurred when the State failed to disclose that the detectives to whom the appellant had confessed had engaged in criminal activity (drug conspiracy and drug use) unrelated to the appellant's case. The detectives were subsequently investigated by the internal affairs division of their police department for this alleged criminal activity. We rejected the appellant's claim because it failed to meet the materiality prong of Brady. In the instant case, Dr. Mittleman was subject only to an administrative investigation, and the record establishes that the State never contemplated criminal charges against him. As in Breedlove, we conclude that no Brady violation occurred. Even if the evidence of the administrative investigation of Dr. Mittleman had been made available to the defense, there is no reasonable probability that the outcome of the proceeding would have been different. See id. at 609. We therefore deny relief on this issue.

State's Closing Argument
Lugo asserts that several statements made by the State during its closing argument in the guilt phase constitute fundamental error and warrant relief in the form of a new trial.[60] Though we are concerned with one set of remarks in particular, we nevertheless conclude that relief based on fundamental error is not warranted in this case.
The prosecutor's statements which cause us concern are those related to an asserted "Golden Rule" argument. During her closing argument, the prosecutor addressed the jury as follows:
Imagine with tape over your mouth and a hood over your head, imagine it on Krisztina. Not on yourselves, on Krisztina and what Krisztina is going through.
An error is fundamental in nature when it "reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." McDonald, 743 So.2d at 505. An improper "Golden Rule" argument typically occurs when counsel asks jurors to place themselves in the circumstances of the victim. It extends beyond the evidence and "unduly create[s], arouse[s] and inflame[s] the sympathy, prejudice and passions of [the] jury to the detriment of the accused." *107 Urbin v. State, 714 So.2d 411, 421 (Fla. 1998) (quoting Barnes v. State, 58 So.2d 157, 159 (Fla.1951)). The prosecutor unmistakably asked the jurors to place themselves in Furton's position, which clearly is error. We reject the State's assertion that the prosecutor's remarks were merely permissible comments on the evidence. A seasoned prosecutor involved in a capital case knows better than to make an improper "Golden Rule" argument. However, because this incident was isolated, and an overwhelming amount of unrebutted evidence exists against Lugo, we determine that the error is, on this record, harmless in nature and therefore deny relief.
Lugo further asserts that the prosecutor's comments about the "gratuitous violence," "the horrible things [that occur] in our world," and the "evil" of Lugo's "hell on wheels" behavior constitute impermissible character attacks that warrant a new trial. The evidence presented by the State had strong indications that Lugo engaged in gratuitous violence and committed horrible acts. Therefore, we decline to find reversible error in those statements. Moreover, while characterizations employing the terms "evil" and "hell on wheels" may have tested the bounds of permissible argument, we determine that these comments conform to our opinion in Crump v. State, 622 So.2d 963 (Fla.1993). In Crump, we concluded that fundamental error did not occur when the prosecutor made an isolated remark during closing argument in the guilt-innocence phase which characterized the defendant as "an `octopus' clouding the water in order to `slither away.'" Id. at 971. As in Crump, relief based on fundamental error is not warranted.
Next, we consider whether the prosecutor's comments describing Schiller as having been "hog tied" and likening his captivity to an "Iranian hostage" situation constituted fundamental error. We considered similar remarks in McDonald. There, the prosecutor in his penalty phase closing argument described in some detail how the victim had been gagged and bound (including being "hog tied") before being drowned. See McDonald, 743 So.2d at 504. We stated in McDonald that while some of the prosecutor's remarks may have been overly emotional and were "ill-advised," id. at 505, they nevertheless did not constitute fundamental error. The same logic applies in the instant case, because "the prosecutor's comments [did not] so taint[ ] the jury's verdict ... as to warrant a new [trial]." Id.
Finally, we consider the prosecutor's remarks that called Lugo's veracity into question. Lugo claims that the prosecutor persistently called him a "liar" or used variations on that term. Here, Lugo's argument has little merit, as the record reveals a plethora of evidence that he consistently engaged in deceitful practices. Those prevarications ranged from Lugo and Doorbal's concoction of the scheme involving phone lines in India to trick Frank Griga into believing he was dealing with legitimate businessmen, to Lugo's use of false names to further his illegitimate business dealings. The prosecutor's comments in this vein resemble those made by the prosecution in Davis v. State, 698 So.2d 1182 (Fla.1997). There, the appellant asserted that the prosecutor engaged in impermissible argument by characterizing the appellant's statements, which had been made to the police, as "bald-faced lies." Id. at 1190. We concluded that the assertion was unavailing, because:
When it is understood from the context of the argument that the charge [of untruthfulness] is made with reference to the evidence, the prosecutor is merely submitting to the jury a conclusion that *108 he or she is arguing can be drawn from the evidence.
Id. at 1190. The same reasoning applies to Lugo's case. In light of the substantial proof of Lugo's deceitful actions, we determine that on the whole the prosecutor's remarks were nothing more than appropriate comments on the evidence. Any error that may have occurred is harmless. We therefore deny relief.[61]
While we deny relief based upon the remarks which were made without objection, we would be remiss if we did not again remind officers of the State that we will not condone improper closing arguments. Here, there was absolutely no need for experienced counsel to walk the line of reversible error by flirting with a "Golden Rule" argument. Even first-year trial attorneys know better than to engage in such behavior, yet a significant case involving enormous judicial and state resources was jeopardized by such foolish remarks. The evidence here was overwhelming but a prosecutor unnecessarily elected to walk a thin line.

PENALTY PHASE

State's Closing Argument
Lugo further contends that the State made several improper remarks in its penalty phase closing argument that warrant relief. Lugo objected to some of these statements, but not to others. We first address those remarks Lugo preserved for review by a contemporaneous objection.
Lugo challenges the following remarks the prosecutor made near the beginning of her closing argument:
PROSECUTOR: You've already determined that the defendant murdered Frank Griga and Krisztina Furton, now your job is to weigh the aggravating factors against the mitigating factors. I'm not here to discuss the merits or the pitfalls of the death penalty. You all agreed when you took your oath that in an appropriate case, if the aggravating factors outweighed the mitigating factors, you could return a recommendation for death. This is done in every single case where the death penalty is imposed. It's not just new to this case. It's a big burden. It's an awesome responsibility. But these are horrible, horrible murders for which there is no other sentence.
LUGO'S DEFENSE COUNSEL: Objection, Your Honor. There is another sentence.
TRIAL JUDGE: Overruled. Deal with it in closing.
In Henyard v. State, 689 So.2d 239, 249-50 (Fla.1996), we stated that "a jury is neither compelled nor required to recommend death where aggravating factors outweigh mitigating factors." However, in Henyard we also determined that no reversible error occurred when the prosecutor at least three times misstated the law with regard to the jury's role in Florida's sentencing scheme. We noted there that the trial judge properly instructed jurors on their role. Lugo here asserts a single misstatement of the law by the prosecutor in her closing argument. Moreover, the trial judge in the instant case properly instructed the jurors on their role in the sentencing scheme. First, in context, there was no legal misstatement of the law. In context, the prosecutor was asserting that the horribleness of the conduct deserved the death penalty as a factual comment, not a legal analysis. Thus, the comment was not erroneous. However, *109 even if it were interpreted as a comment on the applicable law, which we do not believe it was, the trial judge fully and correctly instructed on the subject and the single sentence does not constitute reversible error.
The next set of remarks which Lugo challenges is in the context of Lugo and Doorbal's torturing of Krisztina Furton in an attempt to extract the security codes for Frank Griga's house. Lugo wanted the codes to gain entry into the house to discover information concerning, and to obtain access to, Griga's considerable personal wealth, some of which Lugo believed was in foreign banks.
PROSECUTOR: She tries to give the numbers. And then when she gets upset again, she calls out for Frank, this defendant holds her down and directs Doorbal to shoot her up again.
Now, she's quite dead. Who cares? He's gonna go to the house, take Sabina there, go into the house. They're going to push the buttons, they're gonna get in the house and he's going to have all the money in the world.
What happens to her? She's just garbage. She's going into a packing box in another hour.
But the numbers don't work and he calls up, wake her up [sic]. Get the numbers out again. And she's dead. She's cold and dead. And now, now he's really got garbage, huh? Human bodies that he treats like garbage.
Lugo objected. The trial judge overruled the objection, based in large part on the relationship of the prosecutor's argument to the cold, calculated, and premeditated (CCP) nature of the murders of Griga and Furton. At a sidebar immediately after Lugo's objection to the above remarks, the trial judge noted that during the guilt phase the State presented evidence that Lugo and Doorbal had planned not only to kidnap Griga and Furton, but also to kill them and dispose of their bodies. The CCP aggravator was at issue here and we simply note that two of the elements that must be satisfied for the CCP aggravator to apply are the existence of the defendant's cool, calm reflection and that the murder has been the product of a careful plan or prearranged design. See Woods v. State, 733 So.2d 980 (Fla.1999). Given the evidence of the meticulous planning of the murders in the instant case, the prosecutor's remarks are not so far afield in relationship to two elements of the CCP aggravator as to constitute reversible error. The trial judge did not abuse his discretion in allowing the prosecutor to make this argument.[62]
Lugo did not contemporaneously object to the remainder of the prosecutor's penalty phase arguments which he now challenges. One set of comments deserves analysis.
With regard to Lugo's sentencing, the prosecutor said the following:

*110 PROSECUTOR: Life in prison is not enough for him because he's different. Life in prison is for every single first degree murderer or those that are different get the death penalty. Though it is reserved for crimes that are different, for when the aggravating factors outweigh anything the defendant can give in mitigation. It's for different cases. It's for this case and it's for this defendant. There is no such thing, as I understand, as a run-of-the-mill first degree murder. It's a lot different.
You go into the 7-Eleven, you shot the clerk in the head, he dies like this. That's not different. The diabolical nature of this crime, the planning, what it took to commit these crimes for financial gain makes this case different. Makes life in prison with the ability to see his family, to see his children, to read newspapers, to go to the yard to workout, to do whatever he wants to do. Same thing he's been doing for three years. He deserves a punishment that's different, that fits the crime.
Lugo primarily relies on Hodges v. State, 595 So.2d 929 (Fla.1992), vacated on other grounds, 506 U.S. 803, 113 S.Ct. 33, 121 L.Ed.2d 6 (1992), for his contention that the above remarks constitute fundamental error. In Hodges, the prosecutor presented an argument similar to the one employed in the instant case, to which no contemporaneous objection was made. See id. at 933-34. We determined in Hodges that under the circumstances of the case the argument constituted harmless error. We do the same in the instant case, given the overwhelming and unrebutted evidence of Lugo's guilt, the existence of several aggravating circumstances, and a relative paucity of mitigating circumstances. The remarks did not taint the jury's verdict to the extent that a new penalty phase is warranted. See McDonald, 743 So.2d at 505.
We also determine that relief based on fundamental error is not warranted due to the prosecutor's "no mercy"[63] and "religion"[64] arguments. The "no mercy" argument is similar to the one we determined to be harmless error in Kearse v. State, 770 So.2d 1119, 1129 (Fla. 2000) (determining single comment by prosecutor that jury should not show mercy to defendant convicted of first-degree murder was harmless error), cert. denied, 532 U.S. 945, 121 S.Ct. 1411, 149 L.Ed.2d 352 (2001). Moreover, the prosecutor's allusion to religion in her closing argument was exceedingly brief and any error that may have occurred was harmless at best.
We have reviewed Lugo's other assertions of error in the prosecutor's penalty phase closing argument and conclude that he is entitled to no relief. Finally, our cumulative error analysis convinces us that a new penalty phase is not warranted.

Aggravating Circumstances
As his next major issue, Lugo challenges the trial judge's findings with regard to aggravating and mitigating circumstances. Lugo first contends that the trial court erred in finding the aggravating circumstances of prior violent felony; pecuniary gain; heinous, atrocious, or cruel (HAC); and cold, calculated, and premeditated (CCP).
With regard to the prior violent felony aggravator, the trial judge noted in his sentencing order that "[Lugo's conviction for] the Griga murder is an *111 aggravator of the Furton murder and [Lugo's conviction for] the Furton murder is an aggravator of the Griga murder." The commission of concurrent violent felonies justifies the finding of this aggravating circumstance. See, e.g., Cole v. State, 701 So.2d 845 (Fla.1997). Moreover, the trial court noted that Lugo's convictions for the kidnaping and attempted murder of Marc Schiller also satisfied the requirements for finding the prior violent felony aggravator. The trial judge did not err in finding this aggravator.[65]
Lugo next asserts that the pecuniary gain aggravator is inapplicable to his case, at least as it applies to the murder of Krisztina Furton. Lugo contends that the evidence in the record does not support the notion that he killed Furton with the motive of financial gain. We disagree. At one point during Furton's captivity, Lugo and Doorbal tortured her with handcuffs, a hood over her head, and injection with Rompun. The objective of this torture was pecuniary gain: to force Furton to disclose one or more security codes for Griga's Golden Beach home, which in turn would afford access to Griga's sources of wealth, particularly information with regard to his bank accounts.[66] The fact that Furton died before Lugo could obtain access to the riches (or information about them) in Griga's home does not negate the fact that Lugo and Doorbal planned all along to kill both Griga and Furton after the assets had been obtained. Testimony from Jorge Delgado and other witnesses established that Lugo and Doorbal intended to kill Griga and Furton to eliminate the possibility that they might surface in the same manner as did Marc Schiller, who eventually went to the police after surviving Lugo and Doorbal's murder attempt. There was no error in finding this aggravator.
Nor do we find error in the trial court's decision to find the avoiding arrest aggravator. For the avoiding arrest aggravator to be applicable in the murder of a victim who is not a police officer, witness elimination must be the dominant motive. See, e.g., Consalvo v. State, 697 So.2d 805, 819 (Fla.1996). In his analysis of this aggravator, the trial judge stated:
In a discussion with ... Delgado the day after Griga was killed, Lugo stated that he was angry because "Griga was not supposed to die at that moment." He explained that they [Lugo and Doorbal] were supposed to get all of his money and property before killing him.
... Lugo explained to Delgado that ... corrections officer John Raimondo[] was going to kill Furton for them and dispose of both of the bodies [i.e., Griga and Furton].[[67]] Obviously, [Lugo and Doorbal] were not going to repeat the Schiller fiasco by allowing another witness to survive.
The evidence overwhelmingly shows that the plan was always to eliminate Griga and Furton as witnesses by killing them. The plan was ruined when Doorbal *112 killed Griga while subduing him and, in an effort to keep Furton drugged and extract information from her, gave her an overdose of Rompun, in part on Lugo's instructions, causing her death. Lugo claims that, at the least, the avoiding arrest aggravator is inapplicable to the murder of Furton, because "Doorbal, not Lugo, killed Furton, apparently by repeated injections of [animal tranquilizer]." He ignores the evidence that at least once he injected Furton with Rompun, and specifically directed Doorbal to do the same. The medical examiner testified that these injections of animal tranquilizer were a likely contributor to Furton's death. Thus, as noted by the trial judge, if Lugo's theory of Furton's death is that she died due to the effects of the animal tranquilizer, Lugo's culpability is clear.
Also, as noted in the sentencing order, Lugo never hid his identity from Griga or Furton, making it illogical to assume that he would not do so unless the plan from the beginning was to kill both of them to eliminate the possibility of having witnesses testify against him. Moreover, "[e]ven without direct evidence of the offender's thought processes, the arrest avoidance factor can be supported by circumstantial evidence through inference from the facts shown." Swafford v. State, 533 So.2d 270, 276 n. 6 (Fla.1988). We conclude that the trial court did not err in its conclusion that witness elimination was a dominant motive in the murders of Griga and Furton.[68]
Lugo's contention that the HAC aggravator does not apply to the murder of Krisztina Furton is meritless. First, we reject Lugo's contention that the State was required to establish that he intended to inflict a high degree of pain on Furton. The "intention of the killer to inflict pain on the victim is not a necessary element of the [HAC] aggravator." Guzman v. State, 721 So.2d 1155, 1160 (Fla. 1998). Conscienceless, pitiless, or unnecessarily torturous acts by a defendant justify the finding of the HAC aggravator, as does the defendant's indifference to the victim's suffering. See, e.g., Guzman, 721 So.2d at 1159-60 (Fla.1998).
Moreover, in his sentencing order the trial judge thoroughly examined the reasons for finding the HAC aggravator as applied to the murder of Furton:
After seeing her fiancee [sic] being strangled by Doorbal, she screamed in fear and was immediately tackled by Lugo who proceeded to gag her, handcuff her hands and secure her ankles with duct tape. She was then injected with [horse tranquilizer] in order to reduce her resistance.
The evidence showed that Xylazine[69] works on the nervous system and is used as a horse tranquilizer. An injection of Xylazine would be painful, providing a burning feeling, would cause agitation, salivation and extreme thirst. The person's respiration would lower which, when combined with being bound and gagged, would likely cause a feeling of suffocation. She was kept with a hood over her head to limit her vision.
On the day following Griga's murder... [Furton] woke up and begged to see Griga ... whom she had last seen being strangled by Doorbal. At Lugo's direction, Doorbal injected her again in the ankle [with horse tranquilizer] and Ms. Furton screamed.... She continued *113 begging to see Frank Griga. When Lugo told her she would be taken to see Frank if she answered all of their questions[,] she became nervous again, started shaking and began screaming. Doorbal gave her another injection in the thigh and she screamed out in pain again. It had been less than an hour since the last injection of Xylazine. When she passed out again, [Lugo and Doorbal] left her lying on the stairs while they continued discussing the crime.
. . . .
Ms. Furton's death was protracted. One can hardly imagine a crime more conscienceless, pitiless, or unnecessarily torturous to the victim than this one. Her fear at being bound hand and foot, injected repeatedly with a painful substance while begging to see Mr. Griga, who she had last seen being strangled by Doorbal, must have been overwhelming.... She was obviously aware that after watching Doorbal strangle Griga she had not seen or heard any sign that he was alive. Clearly, there had to be a reason why they were asking her, not Griga, for the codes to his house. Her bodily response to the Xylazine and natural reaction to resist the effects of the drug could only have exacerbated her fear.
. . . .
... The evidence showed that Lugo was the leader of the organization.... Lugo instructed Doorbal to inject Furton [with horse tranquilizer] on several occasions. Doorbal held Furton up by the shoulders so Lugo could question her about the house security codes and the whereabouts of the [in-house] safe. Lugo was the one who headed up the purchase of surveillance equipment for the organization to use in stalking its victims.... Lugo is legally and morally responsible for every single thing that was done to Frank [Griga] and Krisztina [Furton] in this case. He was the director and the driving force.
The evidence, as reflected in the trial court's thorough sentencing order, counters Lugo's claims that Furton was unconscious during her ordeal and therefore endured no pain or suffering. It also obviates the argument that Doorbal, not Lugo, is solely culpable in Furton's murder. We determine that no error occurred with regard to the finding of HAC for the murder of Krisztina Furton.
Lugo next challenges the trial court's decision to find the CCP aggravator. He contends this aggravator should not have been found because "[t]he killings occurred as a result of Doorbal's frenzy, panic, fit of rage or total incompetence." We disagree. Four elements must be established to justify a finding of CCP: (1) the murder must have been the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage; (2) the defendant must have had a careful plan or prearranged design to commit murder before the fatal incident; (3) the defendant must have exhibited heightened premeditation; and (4) the defendant must have had no pretense of moral or legal justification. See Gordon v. State, 704 So.2d 107, 114 (Fla.1997) (quoting Jackson v. State, 648 So.2d 85, 89 (Fla.1994)).
Competent, substantial evidence supports the trial judge's decision to find the CCP aggravator. Lugo and Doorbal coolly and calmly selected Griga and Furton as their victims long before they killed them. Both were enthralled by Griga's wealth, and determined to have it for themselves. They took no real precautions to hide their identities from Griga and Furton, which further supports the notion that they always intended to kill *114 them. The record also establishes that Lugo had contemplated how the bodies would be disposed of well before the murders occurred. Moreover, after Griga died following the altercation with Doorbal, Lugo commented that Griga was not supposed to die before the assets had been secured. Lugo was clearly involved in the planning of the murders to the same extent as Doorbal. We reject the assertion that Griga's murder was nothing more than an unintended result from a "fit of rage" altercation between Doorbal and Griga. In Rodriguez v. State, 753 So.2d 29 (Fla.2000), we upheld the finding of the CCP aggravator as applied to the murders of three victims. There, we discussed the relevant facts that supported the finding of the aggravator in the murders of Sam and Bea Joseph and Genevieve Abraham:
While it is true that Manuel [Rodriguez, the defendant] shot the Josephs while... arguing [with them], the totality of the circumstances ... establishes that Manuel planned to kill the victims prior to the argument, especially given that Manuel took guns and gloves with him to the apartment, knew the Josephs could identify him, ordered [his accomplice] to shoot Abraham after he shot the Josephs, and then fired additional shots from close range to ensure that the victims were dead.
Id. at 46. The circumstances in the instant case are similar. Lugo and Doorbal had handcuffs, duct tape, and animal tranquilizer available to subdue their victims. They clearly knew that their intended victims could identify them, yet made no attempt to conceal their identities. Moreover, Lugo at least once ordered Doorbal to inject Furton with animal tranquilizer, and was aware of most or all of the other injections given to both Furton and Griga. Therefore, we determine that the evidence established not only that the murders of Griga and Furton were the product of Lugo's cool and calm reflection, but also that they were the product of a careful plan or prearranged design in which Lugo fully participated.
Heightened premeditation also exists in Lugo's case. In Gamble v. State, 659 So.2d 242, 244 (Fla.1995), we determined that all of the elements of the CCP aggravator, including heightened premeditation, were satisfied. There, the defendant told his girlfriend six days prior to the killing that he was going to "take out" the victim, who was his landlord. The defendant also rehearsed the murder by practicing choke holds on his girlfriend with a cord. The defendant and his roommate plotted to visit the landlord at his home, under the guise of paying their rent. While the landlord searched for a receipt, the roommate located a claw hammer. Upon the landlord's return, the defendant struck him repeatedly on the head with the hammer. The defendant's roommate also subsequently choked the victim. In the instant case, Lugo and Doorbal planned for weeks to abduct and obtain the assets of their victims, and executed an elaborate plan to ingratiate themselves with the victims. They also planned in advance to dispose of their bodies. As noted above, Lugo's culpability in both murders is without question and his heightened premeditation is without doubt. We agree with the trial judge that "[t]he fact that Lugo was unsuccessful in the completion of his mission does not detract, in any way, from the fact that he had a cold, calculated, and premeditated plan to kill both victims and dispose of their bodies, completely without legal and moral justification."[70] The trial judge did not err in finding the CCP aggravator.

*115 Mitigating Circumstances

With regard to mitigating circumstances, Lugo primarily argues that the trial judge improperly weighed, or erred in refusing to find, the nonstatutory mitigating circumstances that he proffered. We disagree.
"The determination of mitigating circumstances and the weight assigned to each one is within the discretion of the sentencing court." Foster v. State, 778 So.2d 906, 919 (Fla.2000). Lugo first contends that the trial judge erred in not finding as a nonstatutory mitigating circumstance that Lugo was not the "hands-on" killer.[71] We have described above in some detail the bases for our belief that the trial judge correctly concluded that Lugo was just as culpable in the murders of Griga and Furton as was Doorbal. We have also reviewed the record and the trial judge's sentencing order, and conclude that no abuse of discretion occurred in the decision not to find the "hands-on" killer argument as a mitigating circumstance.[72]
Lugo next asserts that the trial judge improperly weighed the following proffered mitigating circumstances: (1) that he is not a totally immoral person and has exhibited great acts of kindness in the past; and (2) that his execution will have a tremendous negative impact upon the lives of his elderly mother, siblings,[73] and six children. The trial court assigned little weight to each of these mitigating circumstances. Regarding the first circumstance, Lugo contends that in the face of his father's abusive behavior during his childhood, he nevertheless persevered and developed into a person who showed great love for his parents. He also emphasizes that after his sister passed away, he adopted her four children and assisted in raising them. Lugo's mother, however, testified that Lugo was raised in a loving home with two good parents. She added that the abusive behavior of Lugo's father was limited to two isolated incidents, and the specific behavior in each was never repeated.[74] We therefore find no abuse of discretion in the trial court's decision to assign little weight to this mitigating circumstance. Acts of kindness, either considered individually or in tandem with Lugo's other mitigating circumstances, do not outweigh the murders here when five aggravators (especially CCP) apply to both, and HAC applies to one of the two. With regard to the second circumstance, too, the trial judge did not abuse his discretion in assigning little weight. While the impact that Lugo's execution would have on his mother and children is properly cognizable, it nevertheless does not outweigh the aggravators attached to the murders of Griga and Furton.
Finally, we note that the trial judge, sua sponte, found the following *116 three mitigating circumstances and assigned little weight to them: (1) Lugo exhibited appropriate courtroom behavior; (2) Lugo assisted the police in finding the torsos of Griga and Furton; and (3) if he is not executed, Lugo would be incarcerated for the remainder of his life and would present no danger to society of committing any other violent acts. Lugo claims that although he presented no evidence to support these circumstances, the trial court nevertheless should have accorded them more weight, which in turn would have resulted in life sentences for each murder. Again, we disagree. The first of these circumstances warrants little discussion, as it clearly does not outweigh two gruesome murders and their associated aggravating circumstances. With regard to the second circumstance, the trial judge did not abuse his discretion in assigning little weight, because Lugo's help was of little value. Although Lugo assisted the police in locating the torsos, he also was aware that the key identifying features (heads, hands, and feet) had been disposed of in a separate location. Thus, this assistance was not of significant mitigation value. We further determine that no abuse of discretion occurred in the assignment of weight to the third circumstance. Under the facts of his case, Lugo's incarceration for the rest of his life does not outweigh, individually or in tandem with other mitigation, his commission of two murders with numerous aggravating circumstances.
Having reviewed the record in his case, including the findings as to aggravators and mitigators, we deny Lugo's requested relief of a new penalty phase.

Sentences for Noncapital Offenses
Lugo briefly asserts that his sentences for the noncapital offenses are "excessive and improper" because of the trial court's decision to impose a departure sentence and to require that all sentences be served consecutively. We disagree with Lugo's contention. The trial judge satisfied all requirements for imposing a departure sentence. We also note that the sentence for each offense did not exceed the statutory maximum. We deny relief on this point.[75]
Lugo also contends that the trial court erred in ordering that his three-year mandatory minimum sentences for robbery with a firearm and kidnaping with a firearm be served consecutively. The robbery occurred when valuables were taken at gunpoint from Schiller while he was inside the van that was transporting him to the warehouse where he would be kept captive for approximately a month. With regard to Lugo's use of a firearm in the commission of a kidnaping, the trial judge instructed the jury as follows:
If you find that Daniel Lugo committed kidnaping and/or extortion, and you also find that during the commission of the crime he carried and/or displayed and/or used and/or threatened to use and/or attempted to use a firearm, you should find him guilty of kidnaping and/or extortion with a firearm.[76] *117 Section 775.021(4)(a), Florida Statutes (2001), states:
Whoever, in the course of one criminal transaction or episode, commits an act or acts which constitute one or more separate criminal offenses, upon conviction and adjudication of guilt, shall be sentenced separately for each criminal offense; and the sentencing judge may order the sentences to be served concurrently or consecutively. For the purposes of this subsection, offenses are separate if each offense requires proof of an element that the other does not, without regard to the accusatory pleading or the proof adduced at trial.
Lugo was the mastermind of the plan to abduct Schiller. Lugo's involvement in the use of the firearm in the kidnaping of Schiller was "sufficiently separate in nature, time, and place from the [robbery with a firearm] charge to justify application of ... consecutive mandatory minimum[ ]" sentences for both robbery with a firearm and kidnaping with a firearm. Murray v. State, 491 So.2d 1120, 1124 (Fla.1986). This involvement occurred primarily at the warehouse where Schiller was held, thereby creating an offense which "represented a separate and additional violation of the victim's most basic rights." Id. We conclude that it was within the trial court's discretion to impose the consecutive sentences and we therefore deny relief.[77]

Proportionality
Lugo contends that his sentences of death are not proportional because co-defendant Jorge Delgado, through a plea agreement with the State, received a fifteen-year prison sentence for his role in the events surrounding the attempted murder of Marc Schiller, and a five-year prison sentence for his role in the murders of Frank Griga and Krisztina Furton. Delgado agreed to testify for the State and was one of its key witnesses, particularly with regard to the abduction and attempted murder of Schiller. With regard to this issue, the trial court said the following in its sentencing order:
[A]lthough Delgado was actively involved in the crimes against Marcelo Schiller, he was hardly involved in the Griga/Furton crimes. The bulk of his involvement was in the disposal of the bodies. The evidence did not reflect that he was ever involved in the plan to kidnap, extort or murder Griga and Furton. In fact, Delgado received a call from Lugo when he needed someone to dispose of the Lambourghini after Griga's murder. Delgado assisted in the disposal of the bodies of the victims. To that extent, he was more of an accessory after the fact. He provided credible *118 testimony at trial and was instrumental in obtaining the convictions. He was the only person who could say what actually happened in Doorbal's apartment to Griga and Furton, based upon his observations and statements made to him by the defendants. Delgado was unfortunately a crucial witness in the prosecution of the most culpable individuals in these crimes and his testimony was repeatedly corroborated by the physical evidence. His involvement in the Griga/Furton crimes pales in comparison with Lugo. His plea offer and sentence for that cooperation, given his lack of actual involvement in the murders, does not adversely affect the proportionality review of Lugo's sentence.
We agree with the trial judge's analysis of this aspect of the proportionality review. Lugo's reliance on Larzelere v. State, 676 So.2d 394 (Fla.1996), is unavailing. Moreover, Larzelere actually supports the conclusion that sentences of death are appropriate for Lugo. In Larzelere, we noted that disparate treatment of a codefendant, including the imposition of the death penalty, is warranted when that codefendant is a more culpable participant in the criminal activity. See id. at 407. The appellant in Larzelere presented an argument similar to Lugo's argument that he was not the "hands-on" killer. We nevertheless affirmed the death penalty, stating:
[The appellant's] participation was not relatively minor. Rather she instigated and was the mastermind of and was the dominant force behind the planning and execution of this murder and behind the involvement and actions of the co-participants before and after the murder. Her primary motive for the murder was financial gain, which motive was in her full control.
Id. In Lugo's case, record evidence reflects that he was a dominant force in the murders of Griga and Furton, and was motivated to a significant degree by pecuniary gain. The decision in Larzelere therefore counsels that sentences of death for Lugo are appropriate.
Lugo's case also bears similarities to other cases in which we have affirmed the imposition of the death penalty. In Knight v. State, 746 So.2d 423 (Fla. 1998), the defendant was sentenced to death for two murders after the jury recommended sentences of death by votes of nine to three. The same five aggravators applicable to both murders in Lugo's case were also applicable to both murders in Knight: prior violent felony; during the commission of a kidnaping; avoiding or preventing a lawful arrest; pecuniary gain; and cold, calculated and premeditated (CCP).[78] In both Knight and the instant case, no statutory mitigators were found to be applicable. Three nonstatutory mitigators, more compelling than the ones found in Lugo's case, were applicable in Knight: the defendant was a victim of childhood abuse; he suffered from some degree of paranoia; and he was raised in poverty. By contrast, Lugo established no evidence of childhood abuse, mental health mitigation, or impoverished upbringing. Given the jury's eleven-to-one votes to recommend death sentences for Lugo, his less compelling nonstatutory mitigators, and the existence of five aggravators that were identical to those found in Knight (along *119 with the applicability of the HAC aggravator to the Furton murder), the decision in Knight further counsels that Lugo's sentences of death are proportional.

Constitutionality of Florida's Capital Sentencing Scheme
Lugo claims that Florida's capital sentencing scheme is unconstitutional. However, he does not rely on opinions which have received a majority of votes from members of an appellate court. We have previously rejected the claim that the death penalty system is unconstitutional as being arbitrary and capricious because it fails to limit the class of persons eligible for the death penalty. See Shere v. State, 579 So.2d 86, 95 (Fla.1991). Moreover, we have stated that "no federal or state courts have accepted [the] argument that a prolonged stay on death row constitutes cruel and unusual punishment." Booker v. State, 773 So.2d 1079, 1096 (Fla.2000) (quoting Knight v. State, 746 So.2d 423, 437 (Fla.1998)). Therefore, we deny relief on this issue.[79]

Conclusion
We have reviewed all of the issues Lugo presents, and determine that he is entitled to no relief.[80] Moreover, we determine that competent, substantial evidence supports all of his convictions, and that his sentences of death are proportional. Accordingly, we affirm Lugo's convictions and sentences of death.
It is so ordered.
ANSTEAD, C.J., WELLS, LEWIS, and QUINCE, JJ., and SHAW and HARDING, Senior Justices, concur.
PARIENTE, J., concurs specially with an opinion.
PARIENTE, J., specially concurring.
I concur with the majority's affirmance of the death sentence, and I further concur in the denial of relief under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), for the same reasons as in my separate opinions in Porter v. Crosby, 840 So.2d 981, 987 (Fla.2003) (Pariente, J., concurring in result only), and Israel v. State, 837 So.2d 381, 394 (Fla. 2002) (Pariente, J., concurring in result only). As in both Porter and Israel, two aggravating circumstances in this case were based on Lugo's contemporaneous felony convictions found by the jury unanimously during the guilt phase of trial. Accordingly, Lugo is not entitled to relief under Ring.
NOTES
[1] The criminal charges that flow from these facts are referred to as the "Schiller counts."
[2] Jorge Delgado was a codefendant with Lugo. In exchange for sentences of fifteen and five years, respectively, for his roles in the attempted murder of Schiller and the murders of Griga and Furton, he testified for the State.
[3] Eventually, however, Delgado changed the name of the company.
[4] At various times, Lugo also did some billing work for both Schiller and Delgado.
[5] Both Lugo and his codefendant, Noel Doorbal, were avid bodybuilders.
[6] Mese was Lugo's codefendant, along with Doorbal. All three were tried together, though separate juries decided the fate of Doorbal and Mese.
[7] Prior to creating the plot to kidnap Schiller, Delgado had expressed concerns to Schiller that the Medicare-related business that Delgado had purchased from Schiller might have been involved in Medicare fraud when Schiller was the owner. Delgado feared that he might have been inadvertently involved in continuing the fraud after he purchased the business from Schiller. Schiller denied that he was ever involved in Medicare fraud. Delgado indicated that he rejected the idea of suing Schiller for the money he claimed because a legal action brought against Schiller might expose the fraudulent activity.
[8] Schiller had previously told Delgado the code for the alarm system at his home.
[9] Schiller did not know if the gun was loaded or not. He also had tape over his eyes during these incidents, as he did for the vast majority of his captivity. On another occasion, Schiller's captors placed a gun in his mouth.
[10] These documents included drafts on his checking account.
[11] The beneficiary was changed to the name of Lillian Torres, Lugo's ex-wife. Torres was also listed as the putative "owner" of Schiller's home when the quitclaim deed was executed. At the time of Lugo's trial and conviction, Torres had not been charged with any crime. The quitclaim deed and the change in beneficiary for the life insurance policies were notarized by codefendant John Mese.
[12] Miami-area police agencies became thoroughly involved in the investigation of the crimes.
[13] Certain documents listed John Mese as president and secretary of Sun Gym.
[14] Doorbal was not convicted of money laundering.
[15] When police executed search warrants at Doorbal's apartment, they found the following items: computer equipment and jewelry belonging to Schiller, receipts for purchases on Schiller's credit card, a receipt relating to the changing of locks at Schiller's home, and handcuffs. Moreover, after executing a search warrant at Lugo's apartment, they found the following: a set of keys for a BMW automobile, an executed deed for Schiller's home, and a letter concerning a wire transfer from one of Schiller's accounts.
[16] We will refer to the criminal charges that stemmed from these facts as the "Griga-Furton counts."
[17] Lugo and Doorbal used a substance known as Rompun, a tranquilizer sometimes given to horses, to subdue Griga and Furton later in the kidnaping episode.
[18] Petrescu rode with Lugo and Doorbal to Griga's home. At trial she supplied many of the details of what happened during this visit.
[19] A warehouse had been rented to hold Griga and Furton captive for an indefinite period, if necessary.
[20] Later, Delgado received a call from Lugo inquiring whether Delgado knew how to drive a Lamborghini, because Lugo was having trouble attempting to do so.
[21] Bartusz testified that Griga was wearing jeans, crocodile boots, and a silk shirt. Furton was wearing a red leather dress, red jacket, and red shoes, and was carrying a red purse. These items, along with other incriminating evidence discussed infra, were subsequently discovered after police executed a search warrant at Lugo's apartment.
[22] The record reflects that, at some point before he was killed, Griga was injected with Rompun. Dr. Allan Herron, a veterinarian, provided expert testimony that the presence of horse tranquilizer in Griga's brain and liver indicated that he was alive when he was injected. Rompun slows respiration and heart rate, and causes salivation, vomiting, and a burning sensation. Dr. Herron stated that there are no clinical uses for Rompun in humans.

Medical examiner Dr. Roger Mittleman testified that Griga was a homicide victim. While he could not pinpoint the exact cause of death, he opined that Griga died from one or more of the following causes: an overdose of horse tranquilizer; asphyxia from strangulation, with the overdose of horse tranquilizer contributing to the asphyxiating effect; or blunt force trauma to his skull and the consequent bleeding (exsanguination) from this blunt force.
[23] Delgado eventually noticed that blood was not only on the walls and carpet of the computer room, but also on much of the equipment and furnishings.
[24] Dr. Mittleman, the medical examiner, opined that the effects from horse tranquilizer were consistent with the cause of her death. He also stated that her death was consistent with asphyxia.
[25] Lugo gave this black leather couch as partial payment to Mario Gray for his assistance in disposing of the bodies of Griga and Furton and other items. Lugo knew Gray from Sun Gym.

Gray assisted in disposing of the torsos and limbs (legs and arms) of both Griga and Furton, which were tightly packed in 55-gallon drums. He also found the site in southern Dade County where the body parts would be disposed. The drums were placed about 100 meters apart. On June 9, 1995, one day after being apprehended in the Bahamas, Lugo led police to the spot where the torsos and limbs were buried. He did not give any indication, however, of the location of the heads, hands, and feet of Griga and Furton.
[26] Police eventually found Griga's yellow Lamborghini abandoned far off a Miami-area roadway.
[27] Upon executing a search warrant at the warehouse in June 1995, police found the following items: fire extinguisher, flint, an owner's manual for a chain saw, and a mask respirator. They also found Griga's auto club card and numerous receipts with his name on them.

In July 1995, acting on an anonymous tip, police found a collection of human heads, hands, and feet in the Everglades off Interstate 75, along with a knife and a hatchet. The appendages were matched to Griga and Furton. Although Lugo and Doorbal had attempted to pull all of the teeth out of the human heads to prevent police from positively matching them to Griga and Furton, one tooth remained in one of the heads. The tooth and head were matched to Griga. Doorbal also told Delgado that he and Lugo had chopped off the fingertips from each of the hands, to prevent police further from matching the hands to Griga and Furton. Expert testimony confirmed that the fingertips had indeed been separated from the hands.
[28] Delgado served as a lookout while Lugo and Doorbal dismembered the corpses. He noticed that Lugo and Doorbal were packing the body parts tightly into drums. He also noticed a collection of heads, hands, and feet in a bucket. He was certain that the chain saw had been used. He surmised that the hatchet must also have been employed, because he heard several loud thumps consistent with those made by a hatchet. Expert testimony confirmed that the corpses were indeed at least partially dismembered by use of a hatchet.
[29] When police executed a search warrant at Lugo's apartment, they found not only the blood-stained computer equipment, but also the following items covered with blood: television, gloves, towels, carpet and padding, and clothing. The blood on these items was matched to Griga. During the search, police also found a computer printout listing Griga's bank accounts, Griga's driver's license, thirty syringes (some filled and some not), a vial marked "Rompun," a stun gun, duct tape, binoculars, and several firearms and ammunition.

Further, police found the following incriminating items when they executed search warrants at Doorbal's apartment: Rompun and several foreign passports bearing Lugo's photograph but names other than "Daniel Lugo."
[30] Those charges were: first-degree murder (two counts), conspiracy to commit racketeering, racketeering, kidnaping (two counts), armed kidnaping, attempted extortion, grand theft (three counts), attempted first-degree murder, armed robbery, burglary of a dwelling, first degree arson, armed extortion, money laundering (nine counts), forgery (six counts), uttering a forged instrument (six counts), possession of a removed identification plate, and conspiracy to commit a first-degree felony.

In the analysis which follows, it is convenient to discuss the criminal charges against Lugo as related to the set of events in which they transpired. Therefore, the following charges are denominated as the "Schiller counts" (those surrounding the abduction, extortion, and attempted murder of Miami businessman Marc Schiller): conspiracy to commit racketeering; racketeering; attempted first-degree murder; armed kidnaping; armed robbery; burglary of a dwelling; grand theft (two counts); possession of a removed identification plate; first-degree arson; armed extortion; money laundering (nine counts); forgery (six counts); and uttering a forged instrument (six counts).
The following charges are denominated as the "Griga-Furton counts" (those related to the abduction, attempted extortion, and murder of Frank Griga and Krisztina Furton): conspiracy to commit racketeering; racketeering; first-degree murder (two counts); kidnaping (two counts); attempted extortion; grand theft; and conspiracy to commit a first-degree felony.
[31] The five nonstatutory mitigators were: (1) Lugo was not a totally immoral person and had exhibited great acts of kindness in the past (little weight); (2) Lugo's execution would have a negative impact on his elderly mother (little weight); (3) Lugo exhibited appropriate courtroom behavior (little weight); (4) Lugo assisted the police after the murders had been committed in finding the torsos of Griga and Furton (very little weight); and (5) life terms for Lugo for each of the murders would permanently remove him as a menace to society (little weight).

The trial judge refused to find two other nonstatutory mitigators: (1) if incarcerated, Lugo would be able to assist other prisoners in learning computer skills; and (2) Lugo should not be sentenced to death because he was not the "hands-on" killer.
[32] See § 895.03, Fla. Stat. (1995).
[33] The State obtained an indictment against Lugo that included (1) charges previously made in an information concerning the abduction, extortion, and attempted murder of Schiller; (2) new charges concerning the Griga-Furton murders and related crimes; (3) a new charge of committing a RICO violation; and (4) a charge of conspiring to commit a RICO violation.

The trial judge also denied Lugo's renewed motions to sever which were made at subsequent points during the trial.
[34] Lugo had also filed a motion to be tried separately from Doorbal and Mese. This motion was denied.
[35] Florida Rule of Criminal Procedure 3.150 states in pertinent part:

(a) Joinder of offenses. Two or more offenses that are triable in the same court may be charged in the same indictment or information in a separate count for each offense, when the offenses, whether felonies or misdemeanors, or both, are based on the same act or transaction or on 2 or more connected acts or transactions.
Moreover, Florida Rule of Criminal Procedure 3.152 states in pertinent part:
(a) Severance of Offenses.
(1) In case 2 or more offenses are improperly charged in a single indictment or information, the defendant shall have a right to a severance of the charges on timely motion.
(2) In case 2 or more charges of related offenses are joined in a single indictment or information, the court nevertheless shall grant a severance of charges on motion of the state or of a defendant:
(A) before trial on a showing that the severance is appropriate to promote a fair determination of the defendant's guilt or innocence of each offense; or
(B) during trial, only with defendant's consent, on a showing that the severance is necessary to achieve a fair determination of the defendant's guilt or innocence of each offense.
[36] As predicate acts for the racketeering charges, the State alleged the following: the events surrounding the abduction and extortion of Marc Schiller; the events surrounding the abduction and attempted extortion of Frank Griga and Krisztina Furton; and the events surrounding the planned, but never executed, abduction and extortion of a man named Winston Lee. Lugo knew Lee because he exercised at Sun Gym. In March or April of 1995, Lugo told Doorbal that he had found another candidate for kidnaping and extortion. That candidate was Winston Lee. Lugo, Doorbal, Delgado, and others surveilled Lee's townhome over a period of time. However, Lee was frequently out of the country and the plan to abduct him was ultimately abandoned. When police executed a search warrant at Doorbal's apartment, they found pictures of Lee's townhome.
[37] In the one case involving racketeering on which Lugo relies, State v. Fudge, 645 So.2d 23, 24 (Fla. 2d DCA 1994), the district court affirmed the trial court's decision to sever multiple counts and to grant a judgment of acquittal on a racketeering charge. However, the trial court's decision to sever in Fudge was made after a trial on all the joined counts, in which the jury was deadlocked on twenty-six charges. Moreover, the district court noted the dissimilar nature of many of the charges that had been joined for trial, including vehicle ramming and grand theft at a closed business establishment. The district court further stated that similar fact evidence with regard to the remaining criminal charges would not have been admissible if separate trials had been held. Conversely, in the instant case, Lugo asked the trial judge to sever the charges in a pretrial motion, before the trial judge had heard any evidence of the relationship to Lugo's racketeering activity of the Schiller counts, the Griga-Furton counts, and the planned (but never executed) abduction and extortion of Winston Lee. Moreover, as discussed infra, we determine that similar fact evidence of the Schiller counts would have been admissible in a separate trial on the Griga-Furton counts, and vice versa. Therefore, Fudge is distinguishable.
[38] In Harvey v. State, 617 So.2d 1144 (Fla. 1st DCA 1993), racketeering activity extending over a period of at least four months did not constitute a temporal separation such that severance of criminal charges was required. The pertinent Florida RICO statutes require that the defendant engage in at least two incidents of racketeering conduct within five years of each other. See §§ 895.02-895.03, Fla. Stat. (1995). Lugo's racketeering activity, which occurred within a six-month time frame, falls well within this requirement.
[39] The substantive Florida RICO statute, section 895.03, Florida Statutes (1993), is patterned after its federal counterpart. Therefore, Florida courts may look to federal RICO decisions as persuasive authority. See Gross v. State, 765 So.2d 39, 42 (Fla.2000); State v. Whiddon, 384 So.2d 1269, 1271 (Fla.1980).

In United States v. Baltas, 236 F.3d 27 (1st Cir.2001), the pertinent indictment listed kidnaping and conspiracy to possess with intent to distribute heroin as predicate RICO acts in which the defendant had participated. The "conspiracy to possess" activity was also listed in the indictment as a separate criminal charge. In determining that the trial court did not err in denying the defendant's motion to sever the RICO counts from the charge of conspiracy to possess and distribute heroin, the Baltas court stated that "offenses committed pursuant to the same (charged) racketeering enterprise and conspiracy may be joined in a single indictment." Id. at 33 (quoting United States v. Zannino, 895 F.2d 1, 16 (1st. Cir.1990)). The court also noted:
"There is always some prejudice in any trial where more than one offense or offender are tried togetherbut such `garden variety' prejudice, in and of itself, will not suffice [to justify severance of charges joined in one indictment]."
Baltas, 236 F.3d at 34 (quoting United States v. Boylan, 898 F.2d 230, 246 (1st Cir.1990)). Furthermore, the Baltas court noted that the trial judge had adopted appropriate measures to prevent spillover prejudice by instructing the jury to consider the evidence separately as to each criminal charge. The trial judge in Baltas thus took pains to ensure that jurors made individualized determinations of guilt. The record indicates that the trial judge in Lugo's case also instructed the jury to consider the evidence separately as to each criminal charge. We are not convinced that the jury failed to make individualized determinations of guilt, as Lugo asserts. Baltas provides further support for the conclusion that the trial court did not err in denying Lugo's motion to sever the criminal charges filed against him.
[40] We are aware that in Bundy the multiple murders occurred in a more compact time frame than in the instant case. However, we also noted in Bundy the existence of evidence of a common scheme that would have been admissible if separate trials on the multiple murders had been held. See Bundy, 455 So.2d at 345. The same logic of the common scheme in Bundy applies to the attempted murder of Schiller and to the murders of Griga and Furton.
[41] We likewise determine that the trial judge did not abuse his discretion in denying Lugo's motion to sever his trial from that of codefendants Doorbal and Mese. The trial judge ordered that Lugo would have a jury separate from that of the jury impaneled for Doorbal and Mese. The heart of Lugo's motion to be severed from his codefendants was the existence of possibly antagonistic defenses between himself and Doorbal. By itself, this is not enough to justify severance of codefendants. See, e.g., Jones v. Moore, 794 So.2d 579, 586 (Fla.2001) (noting that the mere existence of possibly antagonistic defenses among codefendants does not justify severance); McCray v. State, 416 So.2d 804, 806 (Fla.1982) (stating that "hostility among [co]defendants, or an attempt by one defendant to escape punishment by throwing the blame on a codefendant, [is not] a sufficient reason, by itself, to require severance"); see also United States v. Boylan, 898 F.2d 230, 245 (1st Cir.1990) ("So long as there is a responsible basis for the averments, charging an omnibus RICO conspiracy normally supplies the glue necessary to bond multiple defendants together in a single proceeding where all are accused of participating in the conspiracy.").
[42] Lugo requested a judgment of acquittal at the close of the State's case-in-chief. Therefore, in reviewing the sufficiency of the evidence, we "view[ ] the evidence in the light most favorable to the State." Gross v. State, 765 So.2d 39, 46 (Fla.2000).
[43] See § 895.03, Fla. Stat. (2001).
[44] "Enterprise" is defined in the Florida Statutes as follows:

"Enterprise" means any individual, sole proprietorship, partnership, corporation, business trust, union chartered under the laws of this state, or other legal entity, or any unchartered union, association, or group of individuals associated in fact although not a legal entity; and it includes illicit as well as licit enterprises and governmental, as well as other, entities.
§ 895.02(3), Fla. Stat. (2001).
[45] That Schiller was subdued with a stun gun while Griga and Furton were subdued with Rompun does not, as Lugo broadly implies, manifest the unrelated nature of those crimes. Rather, when considered under all of the circumstances under which the organization operated, this shows careful planning on the part of Lugo and his team to carry out the ultimate goals of the organization. We are not convinced that alleged predicate acts must share exactness in every minute detail before they can constitute evidence of racketeering. This does not release the State from the requirement that it must prove the enterprise element along with the element concerning a pattern of racketeering activity.
[46] E.g., walkie-talkies, a stun gun, handcuffs, and duct tape were used in the kidnaping and extortion of Schiller, while Rompun, handcuffs, and duct tape were used in the kidnaping of Griga and Furton.
[47] The pattern of roles does not have to be "unchanging" in the strictest sense. In Gross, we determined that the requirement of an unchanging pattern of roles was satisfied when members of the alleged criminal enterprise assumed functions that "remained more or less the same." Gross, 765 So.2d at 46. Nor is it required that the organization have the same members participating at all times. See id. at 47 n. 6. Thus, the subelement of continuity is still met in the instant case despite the participation of a somewhat varied cast of characters in each of the predicate acts. The important point in Lugo's case is that he, along with Doorbal, was involved in, and a primary participant in, the key phases of each predicate act.
[48] "Pattern of racketeering activity" is defined as follows:

[E]ngaging in at least two incidents of racketeering conduct that have the same or similar intents, results, accomplices, victims, or methods of commission or that otherwise are interrelated by distinguishing characteristics and are not isolated incidents, provided at least one of such incidents occurred after the effective date of this act and that the last of such incidents occurred within 5 years after a prior incident of racketeering conduct.
§ 895.02(4), Fla. Stat. (2001).
[49] Despite Lugo's assertions to the contrary, the similarity and interrelatedness of the racketeering activities listed in the indictment are not in doubt. Evidence presented by the State shows that Lugo and his cohorts in three instances not only targeted specific victims for kidnaping and extortion but also formulated and executed detailed plans to bring their schemes to fruition. Therefore, we focus on whether the State proved the requisite continuity of particular criminal activity.
[50] We noted in Lucas that "[t]he lack of a threat of continuity of racketeering activity cannot be asserted merely by showing a fortuitous interruption of that activity such as by an arrest, indictment or guilty verdict." Lucas, 600 So.2d at 1095 (quoting United States v. Busacca, 936 F.2d 232, 238 (6th Cir.1991), cert. denied, 502 U.S. 985, 112 S.Ct. 595, 116 L.Ed.2d 619 (1991)). Therefore, Lugo's arrest did not obviate the threat of continued criminal activity by the enterprise with which he was associated.

We further stated in Lucas the possibility that the related fraudulent activities occurring over a six-month period could meet the concept of "closed-end" continuity described in H.J., Inc., i.e., that those activities showed the requisite continuity of particular criminal activity because they constituted "a series of related predicates extending over a substantial period of time." Lucas, 600 So.2d at 1094 (quoting H.J., Inc., 492 U.S. at 241-43, 109 S.Ct. 2893).
[51] Specifically, Lugo contends that fundamental error occurred on the basis that the prosecutor improperly argued: the "awful," "evil," "horrible," and "gruesome" nature of the crimes; that Lugo and other defendants were "preying" on their victims; that Lugo's offenses were worse than "any war crime"; that the circumstances of Lugo's case sometimes resembled an "Iranian hostage" situation; and that Lugo and other defendants participated in a "human barbecue" of the murder victims.

Lugo cites no record evidence that he objected to these comments, nor have we found any objection in the record. Thus, we must only analyze the comments under the fundamental error standard.
[52] Lugo's reliance on Crum v. State, 398 So.2d 810 (Fla.1981), is misplaced. In Crum, one codefendant induced the other to believe that they would be presenting consistent defenses at trial. However, after the jury was sworn, the first codefendant altered his defense, asserting that the second codefendant committed the crime. This unforeseen development, after the trial had begun, prejudiced the second codefendant's trial preparation and justified the trial judge's order for separate trials. Similar circumstances did not occur in Lugo's case, nor did circumstances similar to those in Rowe v. State, 404 So.2d 1176 (Fla. 1st DCA 1981), occur here. Lugo's reliance on Rowe is also unavailing.
[53] Testimony from Lugo's federal probation officer established the terms of Lugo's probation. Testimony from a bank official established that Lugo had drawn a check to pay restitution into the depository of the federal court, and testimony from a forensic accountant established that these funds were ultimately traceable to the abduction and extortion scheme related to Schiller.
[54] Lugo also challenges the admissibility of statements regarding his probationary status made by State witness Ed Dubois, a private investigator hired by Marc Schiller. Dubois made the statements during redirect examination by the State. We conclude that Lugo's defense counsel clearly opened the door for such statements when he cross-examined Dubois. We do, however, doubt the admissibility of statements regarding Lugo's probation made by his ex-wife, Lillian Torres, and by his girlfriend, Sabina Petrescu. These statements do not appear to be well linked to Lugo's or Mese's involvement in money laundering. However, these statements by Torres and Petrescu were brief in nature and their admissibility would constitute nothing more than harmless error. We also determine after reviewing the record that all other challenged statements regarding Lugo's federal conviction and probation resulted in at most harmless error. See generally Bryan, 533 So.2d at 747 (determining that harmless error occurred due to introduction of irrelevant collateral crime evidence and concluding that the introduction of this evidence "had no effect on the jury verdict").

Nor are we convinced that the issue of Lugo's federal fraud conviction and probationary status impermissibly became a central focus of his trial. Lugo's trial lasted approximately three months, with testimony on this issue comprising a comparatively small part of the record. Finally, Lugo was not entitled to a jury instruction regarding the limited purpose for which evidence of his federal fraud conviction and probationary status could be used because he failed to request such an instruction. See Pope v. State, 679 So.2d 710, 714 (Fla.1996) (determining that no error occurred when trial judge did not instruct jury on limited purpose for which evidence of other crimes or wrongs could be used, because defendant failed to request the instruction).
[55] Evidence in the record shows that Torres was not present when Schiller was forced to sign the document which transferred ownership of the condominium. Torres signed the document later, at Lugo's direction, with no apparent knowledge that the condominium was related to an extortion plot. At the time of Lugo's trial, the State had not filed criminal charges against Torres.
[56] Schiller was later indicted on federal Medicare fraud charges.
[57] See Richardson v. State, 246 So.2d 771 (Fla.1971).
[58] Therefore, we decline to decide under the facts of this case whether a Brady violation would have occurred if the State actually had had knowledge of Lugo's pending federal indictment.
[59] We also reject Lugo's contention that information related to Schiller's indictment on federal Medicare fraud charges constitutes newly discovered evidence that justified a new trial. Florida Rule of Criminal Procedure 3.600(a)(3) allows a new trial to be granted on the basis of newly discovered evidence when that evidence (1) is material; (2) would have changed the verdict or the pertinent finding of the court introduced at trial; and (3) could not have been discovered and presented at trial upon the exercise of due diligence by the defendant. Based on the analysis above, Lugo cannot satisfy the second prong; it is also doubtful whether he could satisfy the third. No relief is warranted.
[60] Lugo concedes that fundamental error is the only basis for relief because he did not object to any of the remarks at issue.
[61] We further deny relief on Lugo's remaining assertions of fundamental error in the prosecution's guilt phase closing argument. A cumulative error analysis of the prosecutor's erroneous statements also leads to no relief.
[62] In a related argument, Lugo claims reversible error occurred due to the following remarks by the prosecutor, made in the context of the plan to abduct Griga and Furton:

They have to stop at Winn Dixie. And Doorbal's got his gun sticking out because he's a bit unorganized. But Lugo, let me go in and get the tape. Lugo goes in to get the duct tape so they can tape up Frank and Krisztina. Tape them up like animals when they're people. Human beings.
Though Lugo contemporaneously objected, we disagree with his contention that these comments permitted the jury to rely on nonstatutory aggravating circumstances. The record establishes that Lugo purchased tape for the purpose of subduing Griga and Furton. The comments were appropriately related to the evidence.
[63] The prosecutor stated that Lugo deserved "no leniency" and "no mercy."
[64] The prosecutor argued that "[i]n any society, in any religion, [Lugo's case was] the worst."
[65] We also reject Lugo's brief assertion that the murder in the course of a felony aggravator is unconstitutional. See Blanco v. State, 706 So.2d 7, 11 (Fla.1997) (analyzing the system for application of the murder in the course of a felony aggravator and determining that it is constitutional).
[66] It was during the sequence of events in which Lugo was attempting to extract the security codes from Furton that he directed Doorbal to inject Furton yet again with another dose of animal tranquilizer.
[67] However, this part of the plan never materialized. Raimondo left Doorbal's apartment without killing Furton or disposing of any corpse.
[68] Furthermore, Lugo relies primarily on Consalvo v. State, as support for his argument. In Consalvo, we upheld the finding of the avoiding arrest aggravator.
[69] Xylazine is another name for Rompun.
[70] Moreover, Lugo does not attempt to argue that any legal or moral justification exists for the murders, nor do we determine that any exists.
[71] The trial judge instructed the jury, according to Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), as to what they must find before they could recommend a sentence of death.
[72] We further conclude that the trial judge did not abuse his discretion in refusing to find the mitigating circumstance that Lugo possesses skills that could help others if he were imprisoned rather than executed. Specifically, Lugo asserted that he could teach other prisoners to work with computers. The sentencing order notes that Lugo proffered no evidence that he would actually be interested in assisting prisoners with computer learning.
[73] The trial judge noted that no evidence was proffered with regard to Lugo's step-siblings. He therefore made his determination based on the impact of Lugo's execution on his mother and children.
[74] The trial judge therefore indicated that to the extent Lugo argued an abusive childhood as a mitigating circumstance, it was rejected.
[75] Nor do we determine that the trial court engaged in impermissible "double counting" as Lugo contends. The trial court is required to offer a valid reason for its departure sentence. One of the reasons the trial court offered was Lugo's commission of unscoreable capital offenses. Lugo concedes that "capital offenses may be used as grounds for an upward departure." Moreover, each of the trial court's other two reasonsthe heinous, atrocious, or cruel nature of the Furton murder, and the extraordinary physical and emotional trauma visited on both Griga and Furtonindividually is a valid reason for departure. See § 921.0016(1)(b), (l), Fla. Stat. (1997).
[76] The jury's verdict form specifically indicates that Lugo was guilty of using a firearm in the kidnaping of Marc Schiller. It also indicates that Lugo used a firearm in the commission of a robbery.

The trial judge also instructed the jury on the requirements for finding Lugo to have been a principal in a crime:
If the defendant helped another person or persons commit and/or attempt to commit a crime, the defendant is a principal and must be treated as if he had done all the things the other person or persons did if:
The defendant had a conscious intent that the criminal act be done, and
The defendant did some act or said some word which was intended to and which did incite, cause, encourage, assist or advise the other person or persons to actually commit and/or attempt to commit the crime.
To be a principal, the defendant does not have to be present when the crime is committed and/or attempted.
[77] We have also reviewed the sufficiency of the evidence for all of Lugo's convictions, including those he does not specifically challenge. We determine that each conviction is supported by competent, substantial evidence.
[78] We have previously stated that "the CCP aggravator is one of the `most serious aggravators set out in the statutory sentencing scheme.'" Sexton v. State, 775 So.2d 923, 934 (Fla.2000) (quoting Larkins v. State, 739 So.2d 90, 95 (Fla.1999)).

In Knight, the trial court also found that the HAC aggravator applied to both murders; in the instant case, the HAC aggravator applies to the murder of Krisztina Furton.
[79] Although the United States Supreme Court's recent decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), makes it clear that Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), does have application in the capital punishment context, we have recently rejected Lugo's contentions regarding the constitutionality of Florida's death penalty scheme in Bottoson v. Moore, 833 So.2d 693 (Fla.2002), cert. denied, ___ U.S. ___, 123 S.Ct. 662, 154 L.Ed.2d 564 (2002), and King v. Moore, 831 So.2d 143 (Fla.), cert. denied, ___ U.S. ___, 123 S.Ct. 657, 154 L.Ed.2d 556 (2002). Thus, Lugo's assertions are without merit. Additionally, Lugo was convicted by a unanimous jury vote of armed robbery and armed kidnaping among other felonies charged. The existence of prior violent felonies was also established.
[80] We have also applied cumulative error analysis to the errors that occurred at trial, and determine that no relief is warranted.